[No. H030607. Sixth Dist. Mar. 5, 2008.]

BRADFORD HICKS, Plaintiff and Appellant, v.
KNTV TELEVISION, INC., et al., Defendants and Respondents.

[black redaction bars]

## COUNSEL

Coblentz, Patch, Duffy & Bass, A. Marisa Chun and Julia Greer for Plaintiff and Appellant.

Law Office of David C. Codell and David C. Codell for Defendant and Respondent.

## OPINION

**PREMO, J.**—Plaintiff Bradford Hicks, a White man, was the 5:00 p.m. weeknight news anchor for defendant KNTV Television, Inc. (KNTV). When plaintiff's contract expired in 2003, KNTV chose not to negotiate a new contract with him. Several months later the station selected an African-American man to fill the position plaintiff had vacated. Plaintiff sued KNTV and National Broadcasting Company, Inc. (NBC), alleging causes of action for racial discrimination under Government Code section 12940 and for wrongful termination under Government Code section 12940 and 42 United States Code section 1981.[1]

Defendants moved for summary judgment, setting forth evidence to show that they had chosen not to retain plaintiff because the newly hired vice-president of news was dissatisfied with plaintiff's performance on the air. The trial court granted the motion and plaintiff has appealed from the resulting judgment. We shall affirm.

### I. *Facts*[2]

In April 2000, plaintiff signed an employment contract with KNTV. The contract was for a term of one year (May 1, 2000, to April 30, 2001), with

---

[1] Plaintiff also alleged a cause of action for age discrimination but abandoned that claim below.

[2] We take the facts from the record that was before the trial court when it ruled upon defendants' summary judgment motion. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034–1035 [6 Cal.Rptr.3d 441, 79 P.3d 556].)

two one-year extensions exercisable at the option of KNTV. KNTV exercised both one-year options, extending plaintiff's contract to April 30, 2003.

At the time plaintiff signed the contract, KNTV was owned by Granite Broadcasting, Inc., and was operating in the Salinas/Monterey television market. Plaintiff took the position with the understanding that he would be anchoring the 5:30 and 10:00 p.m. weeknight news broadcasts and that he was in line to take over the more coveted 6:00 and 11:00 p.m. spots when the incumbent, Doug Moore, left the station. During plaintiff's tenure with the station, KNTV became an NBC affiliate and began broadcasting in the San Jose/Oakland/San Francisco television market. The San Jose/Oakland/San Francisco television market was fifth in the nation in terms of size, significantly larger than the Salinas/Monterey market.

NBC purchased KNTV on May 1, 2002. Plaintiff was then anchoring the 5:00 p.m. news on weeknights. He also served as a reporter for the 11:00 p.m. newscast and hosted an entertainment and lifestyle program entitled *Wine Country Living*. Plaintiff had not succeeded to the 6:00 p.m. spot. Allen Denton, a White man, had replaced Doug Moore as the 6:00 and 11:00 p.m. anchor.

NBC's purchase of KNTV led to many changes in top management. Linda Sullivan was hired to replace KNTV's president and general manager. The news director was also replaced. On July 15, 2002, KNTV hired James Sanders as vice-president of news. Sanders was responsible for the editorial content and production value of all of KNTV's newscasts.

Sanders assessed the performance of the KNTV news anchors and made several changes. He retained most of the anchors but reassigned some of them. Sanders chose not to retain several others, including plaintiff. Sanders stated that he chose not to retain plaintiff because he found plaintiff's performance abilities were "not consistent with KNTV's expectations for a major network evening news anchor in the fifth-ranked market in the nation." Sanders thought plaintiff's on-air style was "aloof, distant, standoffish, unapproachable, stiff, and too anchor-like." It was not what Sanders wanted for KNTV, which was an anchor who projected a "warm, approachable, credible, welcoming" style. As Sanders explained at his deposition, "I thought he needed to loosen up, to be more himself and to be an anchorman being Brad Hicks and not Brad Hicks trying to play the role of an anchorman. I thought that he came across on the air too much like a person trying to be an anchorman and not enough like a person bringing me the news. I did not

believe he was connecting with the subject matter or the audience, and I thought that he gave the perception of someone giving a recitation of the news, not someone involved with it. I thought that Hicks was not exuding an aura that would make me feel like he was 'one of us,' meaning the audience, and that he was holding the audience at arm's length as opposed to embracing it. I also thought that his on-camera presence and demeanor were such that he came across like a person you wouldn't necessarily say 'hi' to if you passed him on the street." Sanders had received telephone calls from viewers criticizing plaintiff's performance in terms consistent with these observations. Sanders maintained that he had spoken to plaintiff about his dissatisfaction with plaintiff's style on more than five separate occasions when he discussed plaintiff's overall job performance with him. Sanders never gave plaintiff a formal evaluation. Sanders denied that race played any role in his decision.

Plaintiff's personnel file contained a talent development recommendation dated October 2001 that included the following comments: "The key observation we discussed was staying away from the 'Mr. Anchorman' style delivery. You want to keep your performance true to your personality, showing warmth while maintaining the various levels of urgency that exist for every story." The only formal performance review that appears in plaintiff's personnel file is dated July 1, 2002, and is signed by Sanders's predecessor, Bob Goldberger. Goldberger described plaintiff as having "an easy, conversational anchoring style that makes him very watchable." The review credits plaintiff with turning in "strong consumer stories" and commends his dedication and leadership in the newsroom. Under the section entitled "Improvement/Development Needs and Plans" Goldberger wrote: "[Plaintiff's] easy anchor style is a bit polarizing. Some viewers take it as being aloof. [Plaintiff] needs to work on being a bit more commanding, and mainstream." The comments suggest other areas in which plaintiff could improve and end by noting that plaintiff "is one of our best reporters."

Sanders informed plaintiff in early April 2003 that Sanders would not negotiate a new contract when plaintiff's existing contract expired at the end of that month. Sanders did allow plaintiff to remain at KNTV until August to give him the opportunity to find a new job. Plaintiff had asked to stay on as a reporter but Sanders declined, stating that, in his experience, moving a daily evening news anchor to the reporter role "doesn't work." He was concerned that the move would affect the credibility of the news team overall by demonstrating the station's loss of confidence in plaintiff and that it would

dampen morale in the newsroom and allow plaintiff to become disgruntled. Plaintiff ceased working at KNTV on August 15, 2003.

When Sanders first informed plaintiff that he would not renegotiate his contract, Sanders had not identified any potential candidates for plaintiff's position. He recruited for the position mainly by getting the word out to other news directors, anchors, and talent agents. In the search for a replacement, Sanders considered approximately 100 applicants, reading résumés and viewing audition tapes. He interviewed several applicants by telephone. Some time after plaintiff left the station, Sanders first spoke with T.J. Holmes, an African-American man who had been referred to him by someone at NBC. Holmes was the only applicant Sanders personally interviewed. Sanders described Holmes's on-air personality as imparting a sense of warmth, sincerity, and approachability, giving the impression that he enjoyed what he was doing. Sanders hired Holmes on September 15, 2003.

Plaintiff was not the only anchor Sanders did not retain. Sanders decided not to retain news anchors Terilyn Joe, an Asian-American woman, Kim Stephens, a White woman, and Linton Johnson, an African-American man. Sanders did allow Johnson, who had been anchoring the weekend news, to remain as a reporter. Sanders retained news anchors Allen Denton and Brent Cannon, both White men, Laura Garcia-Cannon and Sandy Castelblanco, Hispanic women, and Lisa Kim, an Asian-American woman. In addition to Holmes, Sanders hired Diane Dwyer, a White woman and Kris Sanchez, a Hispanic woman. When the sports and weather anchors, who were both White men, left the station Sanders replaced them with an Asian-American man and an African-American man.

Plaintiff's opposition included evidence to show that he was objectively more qualified than Holmes, having 13 years of journalism experience, eight years as a regular weeknight news anchor, familiarity with the Bay Area, and multiple journalism awards. Holmes, in contrast, had been in journalism for only four years, had no experience regularly anchoring five nights, no familiarity with the Bay Area, and no journalism awards. Plaintiff disputed Sanders's claim that Sanders had verbally counseled plaintiff about his performance. According to plaintiff, Sanders had never said a word about it. He also pointed out that his personnel file contained no documents noting Sanders's alleged dissatisfaction with plaintiff's style. Indeed, Sanders had encouraged him to apply for anchor positions in other markets and had even recommended him to a colleague. When plaintiff had become aware of an open position with an NBC affiliate in Philadelphia he asked Sanders if he thought he ought to apply for it; Sanders encouraged him to do so. Sanders also suggested that plaintiff pursue opportunities with the Fox network. According to Sanders, he made the suggestion because he knew

that Fox was growing and had plenty of openings and he thought plaintiff's "somewhat detached and stentorian style might match their style." Sanders personally recommended plaintiff to Rick Blangiardi, the vice-president and general manager of a Fox-affiliated station in Honolulu, Hawaii. Sanders told Blangiardi that he was in the midst of a lot of changes at KNTV. He said, "Rick, I've kind of come in here with the marching orders to revamp." Sanders told Blangiardi that "a guy was coming out of the station that [Sanders] thought was really talented" and that, if Blangiardi was interested, he should definitely talk to him. Sanders told Blangiardi that plaintiff was "a good reporter, a good storyteller" and a "pretty good investigative reporter," which was one of the qualities Blangiardi was looking for. The only negative thing Sanders said about plaintiff was that, although he is a very good reporter, "he's going to go out on a site, you're going to have to just watch him that way, he's going to get caught up in his stories." Blangiardi interviewed plaintiff for an anchor position but did not hire him due to budget circumstances.

Plaintiff also produced evidence to show that there was pressure in the entire broadcast community to hire minorities. News directors and talent agents had told him that stations often look for people of a certain race or ethnicity to fill vacant anchor positions. Goldberger had told him that KNTV was concerned about appealing to the Hispanic market and that the station had to "pin down this Hispanic thing" when Goldberger decided to audition a Hispanic woman to work with plaintiff on the 5:00 p.m. news. Plaintiff's agent had also told him around that same time (prior to NBC's purchase of the station) that KNTV was specifically looking for a Hispanic news anchor. After plaintiff's departure from the station, news directors in Oakland and Tulsa, Oklahoma told him they were not surprised that he had lost his job; according to them, KNTV had a "known diversity issue." Plaintiff showed that, from January 1, 2003, until September 15, 2003, KNTV was the only major television station in the Bay Area without an African-American anchor. During this time the KNTV Web site identified a picture of Janice Edwards, an African-American woman, as a news anchor when, in fact, she was the host of *Bay Area Vista*, an entertainment program that was not connected to the news department.

In response to a request for documents pertaining to any equal opportunity employment policy KNTV might have, defendants produced a document (document No. 0199) dated January 1, 2003, which appears to compare the percentage of women and minorities employed by KNTV as "2A Reporters" with the percentage of women and minorities available in the workforce as a whole. The somewhat cryptic document indicates that of a total of 36 incumbents, 52.78 percent were women, compared to 51.83 percent available, and 36.11 percent were minorities, compared to 28.37 percent available.

In response to plaintiff's request for documents pertaining to recruitment for the open anchor positions, defendants produced three documents showing the recruitment source (company employee or talent agent), the number of interviewees (one in each case), and the date the vacancy was filled. Defendants also produced Holmes's employment application and a computer log indicating that the 5:00 p.m. anchor position had been posted on GECareers.com. Defendants could not produce the posting itself. Defendants produced no other documents pertaining to their recruitment of a news anchor for the 5:00 p.m. anchor position.

## II. *The Trial Court's Ruling*

The trial court acknowledged that the instant case is not the traditional discrimination case in which the plaintiff is a member of a racial minority. The trial court noted that, although some federal courts require White plaintiffs to produce evidence of "background circumstances" to establish that the defendant "is that unusual employer who discriminates against the majority," California law does not demand such a showing.[3] The court noted, however, that it was not necessary to decide whether plaintiff had been able to prove a prima facie case since defendants had produced evidence of a legitimate, nondiscriminatory reason for refusing to negotiate a new contract with plaintiff and plaintiff's evidence did not raise a reasonable inference that defendants' nondiscriminatory reason was a pretext for unlawful discrimination.

## III. *Discussion*

### A. *Legal Framework*

██ The purpose of summary judgment "is to provide courts with a mechanism to cut through the parties' pleadings in order to determine

---

[3] A plaintiff alleging racial discrimination usually must prove "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 [36 L.Ed.2d 668, 93 S.Ct. 1817].) But where the plaintiff does not belong to a racial minority or other traditionally protected class, no universally accepted statement of the standard for establishing a prima facie case exists. There is currently a split among the federal courts that have taken a position on this issue. Five circuits apply an increased burden upon a White plaintiff, requiring a showing of " 'additional background circumstances' " to support the suspicion of discriminatory intent. (*Mastro v. Potomac Elec. Power Co.* (D.C. Cir. 2006) 371 U.S. App.D.C. 68 [447 F.3d 843, 851]; see *Murray v. Thistledown Racing Club, Inc.* (6th Cir. 1985) 770 F.2d 63, 67; *Mills v. Health Care Serv. Corp.* (7th Cir. 1999) 171 F.3d 450, 456–457; *Duffy v. Wolle* (8th Cir. 1997) 123 F.3d 1026, 1036–1037; *Reynolds v. School Dist. No. 1, Denver, Colo.* (10th Cir. 1995) 69 F.3d 1523, 1534; but see *Iadimarco v. Runyon* (3d Cir. 1999) 190 F.3d 151, 160–161 [rejecting the background circumstances requirement].)

whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 844 [107 Cal.Rptr.2d 841, 24 P.3d 493].) In an employment discrimination case, the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of the plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors. (Code Civ. Proc., § 437c, subd. (p); *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203 [48 Cal.Rptr.2d 448].)

In meeting its initial burden the employer need not rely upon the premise that the plaintiff cannot demonstrate a prima facie case if the employer can set forth admissible evidence of its reasons, unrelated to unlawful discrimination, for the adverse employment action. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 357 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) If the employer meets its initial burden in this manner, the plaintiff then has the burden to produce "substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [67 Cal.Rptr.2d 483].)

The plaintiff must do more than raise the inference that the employer's asserted reason is false. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (*St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 515 [125 L.Ed.2d 407, 113 S.Ct. 2742].) If the plaintiff produces *no* evidence from which a reasonable fact finder could infer that the employer's true reason was discriminatory, the employer is entitled to summary judgment. (*Caldwell v. Paramount Unified School Dist., supra*, 41 Cal.App.4th at p. 203.)

" ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' ([*State Dept. of Health Services v. Superior Court, supra*, 31 Cal.4th] at p. 1035.) We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)

## B. *Analysis*

Plaintiff argues that the trial court erred in concluding that there was no triable issue of fact. According to plaintiff, the trial court shifted the burden of persuasion to plaintiff and improperly weighed the evidence. Given our standard of review, we focus our attention only upon the evidence. Like the trial court, we begin with defendants' evidence of a nondiscriminatory reason for the adverse employment action plaintiff claims to have suffered.[4]

### 1. *Defendants' Evidence of a Nondiscriminatory Reason*

Plaintiff alleged that defendants' decision not to retain him was motivated by the desire to place an African-American in the 5:00 p.m. anchor position. In their moving papers defendants produced evidence to show that Sanders's reason for refusing to negotiate a new contract with plaintiff was unrelated to his race. According to defendants, plaintiff did not project the style or personality Sanders wanted in a KNTV news anchor. Sanders was new to the station as of July 2002. He had been hired as part of the new owner's overhaul of KNTV upper management. Sanders evaluated all the news anchors. After observing plaintiff's performance for about eight months, Sanders decided that plaintiff's style was aloof and distant, unapproachable and stiff. Sanders did not think plaintiff's performance was good enough for a television station in the fifth largest market in the country. This is sufficient evidence of a legitimate, nondiscriminatory reason for refusing to retain plaintiff after his contract expired. Plaintiff's burden then was to show that the "style" rationale was a pretext for defendants' intent to replace him with an African-American.

---

[4] Plaintiff's complaint alleged that he was fired, terminated, and discharged. In his appellate brief plaintiff continues to characterize the adverse employment action as a "termination." Although the parties do not mention the point in their briefs, plaintiff was not terminated in the generally understood sense of that word. Plaintiff's contract expired. Plaintiff's expectation that the contract would be renewed does not mean that he was discharged. His employment ended by operation of the contract. The real substance of plaintiff's complaint is that defendants wrongfully refused to negotiate a new contract with plaintiff and refused to allow him to work for KNTV as a reporter. Whatever terminology he may have used in his pleadings, his claims against defendants could only be for a wrongful refusal to hire (or rehire). It is unquestionably unlawful for an employer, because of a person's race, "to refuse to hire or employ" a person. (Gov. Code, § 12940, subd. (a).) There is an analytical difference, however, between wrongful termination and refusal to hire that affects the elements of the plaintiff's prima facie case (see, e.g., *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at p. 802) and that can affect the running of the statute of limitations (see, e.g., *Williams v. City of Belvedere* (1999) 72 Cal.App.4th 84, 92 [84 Cal.Rptr.2d 658]). Thus, it is important for litigants to recognize the particular species of employment discrimination they intend to pursue. Since this case does not require consideration of plaintiff's prima facie case or the statute of limitations, the imprecision of plaintiff's pleading does not affect our analysis.

## 2.  *No Evidence of Unlawful Discrimination*

### a)  *Subjective Criteria Permissible*

Plaintiff argues that he was objectively more qualified than Holmes. Plaintiff's objective qualifications, however, are not relevant to our analysis since defendants did not cite plaintiff's objective qualifications as their reason for letting him go. The reason was plaintiff's performance on the air. Plaintiff has not squarely challenged the legitimacy of this reason. (*Denney v. City of Albany* (11th Cir. 2001) 247 F.3d 1172, 1186.)

The fact that Sanders's assessment was based upon subjective criteria does not, by itself, demonstrate pretext. It is true, as plaintiff maintains, that subjective evaluations may lend themselves to discriminatory abuse and should, therefore, be closely scrutinized. (See *Warren v. City of Carlsbad* (9th Cir. 1995) 58 F.3d 439, 443.) But there is nothing inherently suspect in the use of subjective criteria. " 'Indeed, subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy. . . . Personal qualities . . . factor heavily into employment decisions concerning supervisory or professional positions. Traits such as "common sense, good judgment, originality, ambition, loyalty, and tact" often must be assessed primarily in a subjective fashion, [citation], yet they are essential to an individual's success in a supervisory or professional position.' " (*Denney v. City of Albany, supra,* 247 F.3d at pp. 1185–1186, quoting *Chapman v. AI Transport* (11th Cir. 2000) 229 F.3d 1012, 1033–1034.) Subjective criteria could be even more important in evaluating a television news anchor who represents the employer to the entire television audience. It is certainly possible that a station could use an objection to the anchor's style or personality as a pretext for unlawful racial discrimination. But absent some evidence that the station made its decisions based upon race, the mere use of subjective criteria does not permit us to second-guess the employer's business judgment. (See *Chapman v. AI Transport, supra,* 229 F.3d at p. 1030 [courts do not sit as " ' "super-personnel department that reexamines an entity's business decisions" ' "].)

### b)  *No Pattern of Discriminatory Hiring*

Plaintiff contends that Sanders's pattern of hiring minorities to replace White anchors demonstrates that his personnel decisions were race based. But we cannot detect a discriminatory pattern in the evidence plaintiff has supplied. For ease of reference we present Sanders's personnel decisions in the following table:[5]

---

[5] Sanders took the actions listed in the table over a more than two-year period, from mid- to late 2002 through the early part of 2005.

| Name | Race | Action |
|---|---|---|
| Brent Cannon | White | Retained as week-day anchor. |
| Allen Denton | White | Retained as week-night anchor, 6:00/11:00 p.m. |
| Laura Garcia-Cannon | Hispanic | Retained as week-day anchor. |
| Sandy Castelblanco | Hispanic | Reassigned to 5:00 p.m. spot. |
| Lisa Kim | Asian-American | Reassigned to 6:00/11:00 p.m. |
| Linton Johnson | African-American | Not retained as weekend anchor; retained as reporter. Hired Diane Dwyer (White). |
| Bradford Hicks | White | Not retained. Hired T.J. Holmes (African-American). |
| Terilyn Joe | Asian-American | Not retained as 6:00/11:00 p.m. weeknight anchor. |
| Kim Stephens | White | Not retained. Hired Kris Sanchez (Hispanic). |
| Nick O'Kelly (weather) | White | Not retained. Hired Rob Mayeda (Asian-American). |
| Chris Flanagan (sports) | White | Resigned. Hired Daryl Hawks (African-American). |

As shown by the table, Sanders did not retain five of the 11 anchors. The five not retained included two White men, one White woman, one Asian-American woman, and one African-American man. Sanders hired two African-American men, a Hispanic woman, an Asian-American woman, an Asian-American man, and a White woman. These choices show no preference for any one group over another.

■ Plaintiff points out that Sanders replaced every White anchor who left the station with a minority, which, he claims, shows that Sanders must have taken race into consideration. Since the number of affected employees was so small, we do not find the pattern to be significant. As one appellate court has explained, the smaller the sample, the greater the likelihood that an observed pattern is attributable to factors other than discrimination. (*Pollis v. New School for Social Research* (2d Cir. 1997) 132 F.3d 115, 121.) More to the point, we can only draw the inference plaintiff urges if we assume that simply failing to replace White employees with other White employees is evidence of racial discrimination. This is an obviously faulty assumption.

### c) *No Evidence of Pressure to Hire an African-American*

It is plaintiff's position that Sanders was under pressure to hire an African-American news anchor because, between January and September 2003, KNTV was the only major Bay Area television station without an African-American anchor. Plaintiff also argues that there was general pressure in the industry to hire minorities and that KNTV was bound by the affirmative action programs of General Electric, NBC's parent company, and by its own affirmative action program. The evidence does not support the inference plaintiff urges.

The only evidence that KNTV might have used race or ethnicity as a hiring criterion is found in the comments of plaintiff's prior supervisor and talent agent to the effect that the station needed to hire a Hispanic anchor to appeal to the Hispanic market. There is no evidence that, after NBC purchased KNTV, it continued to seek talent on the basis of race or ethnicity. There was a General Electric policy that required "affirmative actions to increase opportunities in employment for women, minorities, the disabled and certain veterans." And Sanders understood that the FCC required broadcasters to make a good faith effort to "have as broad, as deep and as diverse a candidate pool as you possibly can for every hire you make." But there is no evidence that KNTV was bound by any policy that required it to make hiring decisions based on race.

Furthermore, in spite of what news directors in Oakland and Tulsa may have believed, there is no evidence that, as of early 2003, defendants were under any pressure to change the ethnic or racial makeup of the news staff. In fact, the evidence points in the other direction. As far as we are able to judge from the record, when Sanders first began making changes in the fall of 2002, KNTV already had more minority news anchors than White male news anchors. Document No. 0199, which plaintiff claimed was part of an affirmative action policy, seemed to show that, as of January 2003, KNTV employed a greater percentage of minorities than existed in the pool of potential

candidates. In short, even if there was industrywide pressure to hire more minority anchors, and even if other news directors believed that KNTV had a diversity problem, there is no evidence that as of early 2003, when Sanders first decided not to retain plaintiff, there was any actual pressure upon him to make room for more minorities.

Plaintiff contends that the station's Web site, which referred to Janice Edwards as an anchor, shows how desperate defendants were to give the impression that the station was more diverse than it was. The argument is not rational. Edwards was employed by KNTV, there was no misrepresentation in that. We cannot fathom how misidentifying her as an anchor on the Web site would have advanced the station's alleged desire to have an African-American anchor on the air. The inference plaintiff would have us draw from this evidence is simply not reasonable.

According to plaintiff, defendants' failure to produce more documents pertaining to the recruitment and hiring of Holmes is proof of their focus upon hiring an African-American news anchor. Part of the argument involves plaintiff's claim that defendants failed to maintain documents as required by FCC rules. The FCC rule to which plaintiff refers requires broadcasters to widely disseminate job information in order to provide equal employment opportunities to a more diverse workforce. (47 C.F.R. § 73.2080 (2007); see *MD/DC/DE Broadcasters Ass'n v. F.C.C.* (D.C. Cir. 2001) 344 U.S. App.D.C. 322 [236 F.3d 13, 16–17].) To assist in evaluating compliance with that requirement, the rule requires stations to maintain records listing all job vacancies, sources of recruitment for such vacancies, the number of interviewees for each position, the referral source for the interviewees, the dates vacancies are filled, and the referral source of the hiree. (47 C.F.R. § 73.2080(c)(5) (2007).) Defendants produced a document listing the number of interviewees for the early evening anchor position (one), the referral source ("Employee Referral"), and the date the position was filled (Sept. 15, 2003). Since Holmes was the only formal interviewee, there were no other statistics to include. Defendants produced a computer log showing the job was posted on GECareers.com, but could not produce a copy of the posting itself.[6] There is no evidence that there were any other advertisements for the position. Indeed, Sanders testified that he recruited by getting the word out to people in the business. Thus, the only FCC-required document that defendants did not produce was a copy of the GECareers.com posting. There is no evidence that defendants intentionally withheld or destroyed any evidence they were required to maintain.

---

[6] Plaintiff ultimately obtained a copy of what he believed to be the job listing. Since plaintiff was unable to authenticate the document, the trial court excluded it.

Defendants were unable to produce any other documents relating to the recruitment of Holmes aside from Holmes's employment application; there were no résumés, applications, or videotapes from any other applicant for the job. (There was no videotape or résumé from Holmes, either.) This, plaintiff maintains, is further proof that defendants were set on finding an African-American and were not recruiting as widely as the FCC requires. The assumption implicit in plaintiff's argument is that Sanders's word-of-mouth recruiting allowed him to specify that he was looking for applicants to fit his alleged racial preferences. But there is no evidence that Sanders ever so specified. Plaintiff's contention that he did is speculative only.

We cannot help but observe that the only reason KNTV had no African-American news anchor from January through September 2003 is because, sometime in October or November 2002, Sanders had removed Linton Johnson from his weekend anchor position. If anything, Sanders's removal of Johnson shows that he was not under any pressure to make sure KNTV had an African-American anchor.

### 3. *No Evidence That Defendants' Asserted Reason Is False*

Further undermining plaintiff's claim is the fact that plaintiff was unable to produce any substantial evidence to show that defendants lied about their reason for refusing to negotiate a new contract with plaintiff. Indeed, most of the evidence on the point tends to corroborate Sanders's determination that plaintiff's on-air style was not optimal.

Plaintiff maintains that he was performing competently and had received compliments from his supervisors and coworkers and that viewer reaction to him was positive, but that is not what the record shows. Rather, the record demonstrates that plaintiff did not possess the qualities Sanders was seeking for an evening news anchor. Although plaintiff may have been complimented for various newscasts and for his reporting skills in general, that does not controvert evidence that his anchoring style was aloof, distant, or unapproachable. Indeed, plaintiff's previous supervisors passed over him for the 6:00 p.m. anchor position when they replaced Doug Moore with Allen Denton. The 6:00 p.m. weeknight news is a station's primary news program and plaintiff admitted that his goal was to be the 6:00 p.m. anchor. The evidence showing that plaintiff's previous supervisors passed over him for that position raised the inference that they did not consider him to be qualified for it.

Other evidence corroborates Sanders's assessment of plaintiff's style. The October 2001 talent development recommendation indicated that the talent coach had observed plaintiff's performance and recommended that he stay

away from "the 'Mr. Anchorman' style delivery. You want to keep your performance true to your personality, showing warmth . . . ." Goldberger's written evaluation contained favorable comments on plaintiff's reporting and leadership but described plaintiff's "easy anchoring style" as being "a bit polarizing to some viewers" and that some viewers take it as being "aloof." And Sanders had received complaints from viewers about plaintiff's style. All this evidence tends to support Sanders's determination that plaintiff's on-air personality was not as warm or approachable as the station desired. There is no evidence to the contrary.

■ It is true that Sanders did not document his dissatisfaction with plaintiff's performance but the absence of documentation does not raise an inference of pretext. A party's failure to produce evidence may allow for the inference that the evidence would have been unfavorable to the party but the inference generally applies when the party has intentionally concealed or destroyed the evidence. (*Zimmermann v. Associates First Capital Corp.* (2d Cir. 2001) 251 F.3d 376, 383; see Judicial Council of Cal. Civ. Jury Instns. (2007) CACI No. 204 ["You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."].) There is no evidence here that Sanders ever made any note of his reasons for declining to negotiate a new contract with plaintiff and no evidence that defendants intentionally destroyed or concealed any such evidence.

Nor is this a case like *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1123, in which there was no documentation to support the defendant's claim that its failure to promote the plaintiff was due to a hiring freeze. *McGinest* held, "the fact that a company the size of GTE does not have a memorandum, meeting notes, or other evidence of this hiring freeze or the financial difficulties that allegedly spurred the hiring freeze provides circumstantial evidence that the hiring freeze did not in fact exist." (*Ibid.*) In contrast, it is not so strikingly unusual that a single supervisor might not document his dissatisfaction with a single individual, particularly when the individual was working under a contract that was about to expire anyway. Furthermore, any unfavorable inference one might otherwise draw from Sanders's failure to place a note of his dissatisfaction in plaintiff's personnel file is neutralized by the fact that the file contains other evidence to support Sanders's complaint about plaintiff's performance.

Plaintiff argues that Sanders's help with plaintiff's search for a new job shows that Sanders was not really dissatisfied with plaintiff's performance. But as Blangiardi confirmed, Sanders recommended plaintiff as a good *reporter*, not an anchor. Sanders said plaintiff was "a good reporter, a good

storyteller" and a "pretty good investigative reporter." Sanders said nothing about plaintiff's performance as an anchor. His suggesting that plaintiff pursue positions with other news organizations says nothing about Sanders's actual view of plaintiff's skills. To the contrary, Sanders's failure to describe plaintiff's skills as an anchor when he recommended him to Blangiardi implies that Sanders was not satisfied with those skills.

■ Plaintiff claims that Sanders's disparate treatment of Johnson, the African-American anchor Sanders allowed to continue as a reporter, shows that Sanders discriminated against plaintiff based upon his race. Plaintiff maintains that Sanders's concerns (morale, news team credibility, disgruntled employees) would have been equally applicable to Johnson. But Johnson had been a weekend news anchor whereas plaintiff had been a regular weeknight news anchor. Sanders was concerned that switching the *daily* evening news anchor to a reporter position would affect the credibility of the news team overall. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." (*Chapman v. AI Transport, supra,* 229 F.3d 1012, 1030.) A reasonable employer might well be more concerned with viewer and employee reaction to the demotion of a regular weeknight news anchor than he or she would be with demoting someone who only anchored weekend newscasts. Furthermore, we know nothing about the particulars of Johnson's contract with the station. In short, plaintiff has not shown that his situation was equivalent to Johnson's such that he should have been treated exactly the same.

There is a factual dispute over whether Sanders ever counseled plaintiff about his performance; Sanders said he did so on at least five occasions; plaintiff says he never did. The dispute is not material. Accepting plaintiff's evidence as true, the logical inference is that Sanders lied about counseling plaintiff. Although plaintiff argues that we may draw from this the further inference that Sanders's real reason for refusing to renegotiate his contract was Sanders's desire to make room for an African-American anchor, such an inference is weak at best. In light of all the other evidence, it is not reasonable.

### C. *The Cumulative Evidence Does Not Create a Triable Issue*

Plaintiff cites *Ryther v. KARE 11* (8th Cir. 1997) 108 F.3d 832, in support of his argument that the accumulation of the evidence is sufficient to raise a triable issue. The case is distinguishable. *Ryther* was an age discrimination case involving a television sportscaster. The defendant had refused to renew

the plaintiff's contract and claimed as its reason receipt of a 1990 Gallup survey showing the plaintiff's performance to be suboptimal. The primary issue was whether the overall market research was the true reason for the plaintiff's dismissal or merely a pretext for age discrimination. (*Id.* at p. 835.) The evidence included facts to show that the market research was an unreliable measure of the plaintiff's performance and, even so, the plaintiff was still the number two sportscaster in the market as a whole and above all other sportscasters at the station. (*Id.* at pp. 838–839.) The talent coaches' performance assessments were unreservedly favorable to the plaintiff and were critical of his eventual younger replacements. (*Id.* at p. 839.) And the vice-president of news, who was responsible for the plaintiff's dismissal, had given him a glowing " 'commendable' " recommendation just one year before he was forced out. (*Id.* at p. 839; see *id.* at p. 835.) The appellate court held that, in view of all that, a reasonable jury might have rejected the market research as the reason for the plaintiff's termination. (*Id.* at p. 839.) Evidence of age-based *animus* in the workplace could have supported a finding that the real reason the plaintiff was dismissed was his age. (*Id.* at p. 844.) Since the plaintiff had produced evidence to support his prima facie case, strong evidence of pretext, and indications of age-based *animus* in the work environment, that was sufficient to allow the trier of fact to find intentional discrimination. (*Ibid.*)

In contrast, there is no evidence in this case to support a finding that Sanders's dissatisfaction with plaintiff's performance was pretextual. There is no evidence to conflict with Sanders's opinion. Independent evidence in plaintiff's personnel file actually supports it. Furthermore, there is no evidence of race-based *animus* or discriminatory hiring practices. There is no detectable pattern of invidious discrimination in Sanders's hiring decisions. There is no evidence of any kind to suggest that anyone at KNTV was dissatisfied with plaintiff on account of his race. Notwithstanding any alleged pressure within the industry to hire more minorities, or the belief of news directors in Oakland and Tulsa that KNTV had a diversity problem, there is no evidence that defendants were under any pressure to change the racial or ethnic makeup of the news staff at KNTV when plaintiff was dismissed in 2003. There is no connection between Sanders's decision not to renew plaintiff's contract and his decision to allow Johnson to stay on as a reporter. Nor does the fact that someone misidentified Edwards as an anchor on the Web site have any rational connection to Sanders's decision.

██ The only evidence that is arguably relevant to prove plaintiff's claim is plaintiff's allegation that Sanders never actually communicated his dissatisfaction to plaintiff personally. While the evidence might support a finding that Sanders lied about his reason, standing alone as it does, it cannot rationally support the ultimate inference required to reach a jury, which is that plaintiff was not retained because he was White.

## IV. *Disposition*

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.