Filed 6/30/22  Ransford v. So. Cal. Permanente Medical Group CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| CARRIE RANSFORD, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, <br><br> Defendant and Respondent. | B309713 <br><br> (Los Angeles County Super. Ct. No.19LBCV00325) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Affirmed.

Law Offices of Gavril T. Gabriel and Gavril T. Gabriel for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza and Amy E. Rankin for Defendant and Respondent.

# INTRODUCTION

Carrie Ransford sued her former employer, Southern California Permanente Medical Group (SCPMG), for wrongful termination and other claims. Ransford alleged that SCPMG discriminated against her due to a disability and for taking medical leave. SCPMG moved for summary judgment, presenting evidence that Ransford was terminated as a result of a long history of unsatisfactory job performance, including communication problems with patients and staff. The trial court granted SCPMG's motion.

We affirm. The evidence Ransford presented did not meet her burden to show that SCPMG acted with discriminatory animus or that the reasons for her termination were pretextual.

# FACTUAL AND PROCEDURAL BACKGROUND

## A.    Complaint

Ransford filed a complaint alleging causes of action for wrongful termination, intentional infliction of emotional distress, negligent infliction of emotional distress, failure to pay wages due upon termination (Lab. Code, § 201), and waiting time penalties for failure to pay wages due upon discharge (Lab. Code, § 203).[1] Ransford alleged she began working for SCPMG in September 1999 as a licensed vocational nurse (LVN). She was on medical leave on the following dates: July 21, 2015 to August 8, 2015; September 14, 2015 to October 18, 2015; November 19, 2015 to December 16, 2015; December 28, 2015 to August 22, 2016; and August 31, 2016 to January 22, 2017. Ransford alleged that on January 26, 2017, she received a "Corrective Action Level 4

_____

[1]    Ransford also alleged a cause of action for unfair business practices (Bus. & Prof. Code, § 17200, et seq.), but she later abandoned that claim.

write-up" that included allegations dating back to 2015. On February 10, 2017, she was suspended following an incident in which she relayed medication instructions to a patient, and was later accused of giving incorrect information to the patient. Ransford remained suspended until her employment was terminated on May 24, 2017.

Ransford alleged that her disability and time on medical leave were substantial motivating reasons for her termination, and that she was terminated "because of her disability." She also contended that although she took three days of bereavement leave in August 2016, she was only paid for one day. She prayed for compensatory damages, punitive damages, penalties, costs, and attorney fees.

## B. Motion for summary judgment

### 1. *Motion*

SCPMG moved for summary judgment. (Code Civ. Proc, § 437c.) It stated that Ransford began working as an LVN with SCPMG in 1999. In January 2015, she transferred to the Healthy Heart Clinic (HHC) at the South Bay Medical Center, which treats patients with a history of heart failure. Ransford's job duties included addressing and monitoring patients' conditions, and notifying health care professionals for disposition; "rooming" patients on arrival, which consists of taking patients to examination rooms and taking their vitals; providing medical information and education to patients; and "performing other duties as directed by medical providers." Ransford's supervisors were Ruthie Goldberg and Demetria Flores. SCPMG asserted that the following incidents occurred while Ransford was working at the Healthy Heart Clinic.

In April 2015, a patient's spouse reported to Ransford that the patient was suicidal. Ransford conveyed the message to the medical care provider, but she did not mark the message urgent, as she was expected to do.

On April 22, 2015, a patient presented with a low blood oxygen saturation level. Ransford did not immediately inform any medical provider of the patient's blood oxygen saturation level.

On May 1, 2015, a patient complained to Ransford about chest pains. Ransford sent a message conveying the patient's complaint, but did not mark the message urgent as she was expected to do.

On May 15, 2015, nurse practitioner Linda Bojorquez reduced a patient's dosage of furosemide to one 20-milligram tablet per day. When the patient's wife called on May 18 to inquire about the correct dosage, Ransford incorrectly told the patient to take two 20-milligram tablets per day.

In May 2015, Bojorquez asked Ransford to cancel one patient's appointment and move another patient's appointment. Ransford complied, but failed to notify the patients of the changes. When one patient arrived for the originally scheduled appointment, the patient was upset about not being informed about the change.

On June 4, 2015, Bojorquez asked Ransford for information about a patient, and Ransford refused to relay the information, saying it was written down in another room.

In June 2015, Goldberg noticed that Ransford was rooming patients at a low rate. Goldberg stated in a declaration that some patients "were roomed by HHC medical providers themselves. HHC medical providers should not have to take the time to room

4

their own patients, as it takes time away from the higher level scope of their job duties."

On July 1, 2015, Bojorquez asked Ransford to follow up regarding a patient. Ransford replied in a disrespectful manner that it was not her responsibility.

On July 2, 2015, Flores asked Ransford to document which phone numbers she used to make follow-up calls. Ransford "rolled her eyes" and complained "in an adamant and defensive manner" that she was being micromanaged. Flores also stated in her declaration that Ransford often rolled her eyes when she was told to do something she did not want to do.

On July 17, 2015, Ransford, Flores, Goldberg, and a union representative met to discuss these complaints against Ransford, and to tell Ransford that management expected to see improvement. Goldberg stated in her declaration that additional meetings with Ransford were scheduled for July 23 and 30. However, Ransford took medical leave from approximately July 21, 2015 to August 2, 2015 and from September 14, 2015 to October 18, 2015. Goldberg stated that because of Ransford's leaves, the scheduled meetings never took place.

On November 9, 2015, Bojorquez asked Ransford to room a patient, and Ransford did not do it.

On November 10, 2015, Ransford messaged Bojorquez to take a phone call from a doctor. Bojorquez, who was on another phone call with a doctor, messaged back to ask for clarification as to whether the caller was a patient; Ransford responded that it was a doctor. While Bojorquez was on the phone, Ransford entered the room and said to her, "You really make me look stupid. What part of doctor do you not understand?"

5

Ransford took leave from November 19 to December 16, 2015, from December 28, 2015 to August 22, 2016, and from August 29, 2016 to January 21, 2017. On March 9, 2016, while on leave, Ransford went to the HHC to visit with coworkers, bringing what she claimed was a service dog. A department administrator, Hector Garcia, questioned why Ransford was in the back office with a dog. Garcia threatened to call security, and Ransford left.

On January 27, 2017, Ransford received a Level 4 Corrective Action concerning the complaints dating back to 2015. Goldberg stated in her declaration that a meeting regarding this corrective action was not held earlier due to Ransford's extended leaves and Goldberg's inability "to coordinate my schedule and the schedule of Human Resources and union representation to proceed appropriately with the corrective action process." On January 31, Ransford signed a related "last chance agreement" stating that she would complete tasks as assigned, use good communication skills, and not act inappropriately.

On February 7, 2017, pharmacist Leslie Idos left a message for a patient to discontinue taking furosemide for three days. Idos stated in her declaration, "I was nearby when the patient's wife called back and spoke to Ms. Ransford. . . . I heard Ms. Ransford say, 'He is due for his evening dose of Furosemide a half of a tablet tonight?' [Ransford] then said: 'He can take his half tablet dose of Furosemide this evening. Hold the Furosemide on Wednesday and Thursday.' This instruction contradicted my message to the patient and placed the patient at risk of serious harm from kidney damage." Idos called the patient back and instructed that he should not take the furosemide for three days. When Idos confronted Ransford an hour after the call, Ransford

6

became defensive and claimed she did not recall what she told the patient, which Idos found "not credible."

The following day, Idos told Goldberg and Flores that she "could not trust Ms. Ransford to convey messages, and that her actions demonstrated a lack of competency and ability to be cognizant of what Ms. Ransford was telling patients." Goldberg stated in her declaration that when she discussed the issue with Ransford a week later, she also found Ransford's lack of memory about the incident not credible. Ransford was suspended with pay on February 10, 2017. Goldberg stated in her declaration, "Ms. Ransford's error could have resulted in severe harm to the patient. I also determined that Ms. Ransford's actions violated her last chance agreement. Considering the severity of Ms. Ransford's conduct and her continued pattern of lack of good judgment, I decided to terminate Ms. Ransford's employment." Ransford's employment was terminated on May 24, 2017.

SCPMG argued that Ransford could not establish that discrimination was a substantial motivating factor for SCPMG's actions. SCPMG pointed out that when Ransford was asked in her deposition, "Do you believe that you had a medical condition that people used to treat you differently?" she answered, "No." Ransford also testified, "I don't believe they terminated me because they didn't like me or like the way I worked. I believe they terminated me for accusing me of a mistake, a medication error, and putting a patient at risk, and I don't feel I'm a risk to patients whatsoever and I don't agree that that happened." SCPMG argued that Ransford was not performing her duties competently, it had legitimate business reasons for terminating her, and she could not demonstrate that SCPMG's reasons were pretextual. SCPMG further asserted Ransford could not

establish the intentional and negligent infliction of emotional distress causes of action for the same reasons, and that those causes of action were barred by workers' compensation exclusivity.

Regarding Ransford's wage claims, SCPMG asserted that Ransford's employment was governed by the collective bargaining agreement (CBA) between SCPMG and the United Healthcare Workers union. SCPMG argued that Ransford was required to comply with the terms of the CBA regarding wage claims, which required her to file a grievance for "any dispute concerning wages." The CBA stated that a grievance "shall be initiated . . . by the submittal of a grievance form from the union to facility human resources and copied to the involved supervisor." A declaration from the human resources consultant for the Healthy Heart Clinic stated that Ransford never filed a grievance for unpaid wages or bereavement leave. SCPMG asserted that Ransford's failure to follow CBA procedures was fatal to her claims for unpaid wages.

2.  *Opposition*

In Ransford's opposition, she asserted that "none of the incidents listed on the Level 4 occurred as SCPMG alleges." Ransford stated that although she met with Flores, Goldberg, and a union representative in July 2015, the supervisors "told me generally that there had been complaints about my work, but they did not describe any specific incidents or particular patients." Ransford said she left the short meeting "with the impression that they wanted to see improvement, but not that they were considering any serious corrective action."

Ransford explained that she took leave after she injured her back at work. She tried to return to work several times, but

bending, twisting, and lifting were "still causing tremendous pain." Ransford stated that during the times she was working between leaves from August 2015 to August 2016, no one told Ransford they wanted to meet with her again regarding her work performance. It was only after she returned from leave in January 2017 that her supervisors said they wanted to discuss her work performance.

Ransford stated in her declaration that in the January 2017 meeting, the 2015 incidents "occurred such a long time ago and were so vaguely drafted that I could not understand what my supervisors were referring to." However, in her opposition Ransford asserted that in the April 2015 incident in which the patient was suicidal, she immediately verbally informed a medical provider about the issue. Ransford also argued that comparing the rate at which another employee roomed patients was misleading, because the other employee was a medical assistant, not a nurse, and had different duties than Ransford. Ransford admitted that "she 'constantly' rolls her eyes in her everyday life as it is a character trait out of her control and which runs in her family." She did not dispute that she told Flores that she felt micromanaged, but argued that "[g]iving feedback to managers is not a cause for termination." She stated that she signed the Level 4 Corrective Action in January 2017 because she felt she had no other choice. Ransford stated that she asked her union representative to file a grievance regarding the corrective action, but the representative failed to do so.

Ransford argued that SCPMG "fail[ed] to establish, as a matter of law, that [Ransford] ever violated the Last Chance Agreement before it terminated her employment." She stated that Idos's representation of the February 7 incident was false.

9

Ransford pointed out that Idos's note regarding the patient's medications stated, "Tentative plan when pt returns call:  [¶] Hold Lasix and KCI x 2 days 2/8/17 and 2/9/17.  [¶] Resume lower doses of Lasix . . . and KCI . . . as of 2/10/17."  The message said nothing about the patient's medication dose for February 7. Ransford stated that when the patient's wife called on February 7, she simply relayed  the message that Idos left. Ransford did not recall specifically discussing the patient's dose for February 7, but said that if the patient had asked about it, she would have documented it.  Ransford also stated that employee Myra De Vera was sitting next to her during the call, and "Myra would have intervened if she believed I made a mistake endangering the patient's health."  Ransford also disputed some details about Idos's version of events, such as whether Idos called the patient to correct the error, as opposed to the patient calling the clinic again.

Ransford argued that the delays in discipline for the 2015 incidents, along with the "flagrant, unexplained inconsistencies in SCPMG's evidence" established a prima facie case for disability discrimination.  She argued that the inconsistencies in Idos's statements showed that the basis for her termination was pretextual.  She also argued that her evidence demonstrated a triable issue as to SCPMG's motive.  Ransford further asserted that she raised triable issues of fact as to her intentional infliction of emotional distress claim. She also argued that she was entitled to two additional days' pay for bereavement leave, and she was not required to file a grievance under the CBA.

SCPMG filed a reply in support of its motion, asserting that the evidence Ransford presented was insufficient to demonstrate a triable issue of fact on any cause of action.

10

### 3.    *Hearing and ruling*

At the hearing on the motion, the court announced that its tentative ruling was to grant the motion.  The court stated that SCPMG met its initial burden to show a legitimate basis for Ransford's termination.  Addressing the wrongful termination cause of action first, the court noted that although there were some disputed details about the events of February 7, it was undisputed that Idos perceived that Ransford gave a patient incorrect medication instructions, and Idos contacted the patient again to provide correct instructions.  The court stated, "[T]he seriousness of what happened and the belief by [SCPMG] given [Ransford's] history that termination was proper can't be disputed simply because [Idos] and [Ransford] disagree as to the exact events."  The court also said that the timing of the termination following Ransford's leaves, without more, was insufficient to create a triable issue of fact.  The court held that Ransford's claims for intentional and negligent infliction of emotional distress were derivative of the wrongful termination claim, and could not survive for the same reasons.

Turning to Ransford's wage-based claims, the court stated that Ransford was required to "follow the procedures set forth in the collective bargaining agreement before she may maintain" these causes of action.  The court said SCPMG demonstrated that Ransford did not follow those procedures, and therefore the motion should be granted on the two wage-based causes of action.

Ransford's counsel argued there were discrepancies in the evidence about what happened on February 7.  The court suggested that no matter which side was right about the details, SCPMG could "look at the incident generally and say enough is enough, we're going to terminate her even if it turns out that

11

factually they're wrong," in which case the termination would be unrelated to any perceived disability. Ransford's counsel asserted that such a situation would offer a mixed motive, with both legitimate reasons and discriminatory reasons for the employment action. Counsel for SCPMG argued that the timing of Ransford's discipline did not suggest discrimination, noting that Goldberg stated in her declaration that a discipline meeting was not held earlier due the inability to schedule a union representative for a meeting earlier during the short periods Ransford was not on leave. Ransford's counsel also argued that Ransford was entitled to bereavement leave pay, but acknowledged that she did not file a grievance. The court stated that it was not persuaded to change its ruling.

The court therefore granted the motion for summary judgment. In the order prepared by SCPMG's counsel and signed by the court, the court stated that Ransford did not show a triable issue of fact for her cause of action for wrongful termination. The court stated that Ransford's causes of action for intentional and negligent infliction of emotional distress failed "because they are based on wrongful termination and are also barred by workers' compensation exclusivity." Regarding the wage claims, the court stated that Ransford was required to "follow the procedures" of the CBA, but she did not do so "because she did not file a grievance for unpaid wages." The court entered judgment in favor of SCPMG. Ransford timely appealed.

## DISCUSSION

Ransford asserts that the summary judgment motion should have been denied because she raised triable issues of fact. SCPMG asserts that the motion was properly granted.

12

Summary judgment is appropriate when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant may establish that a cause of action has no merit by demonstrating that there is a complete defense to that cause of action. (*Id.*, subd. (p)(2).) "We review the trial court's grant of summary judgment de novo and decide independently whether the parties have met their respective burdens and whether facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1484.) "[A] trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

## A.  Wrongful termination

### 1.  *Legal standards*

"'The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm.'" (*Nosal-Tabor v. Sharp Chula Vista Medical Center* (2015) 239 Cal.App.4th 1224, 1234-1235.) Here, Ransford alleged that "disability [and] her time on medical leave were substantial motivating reasons for [SCPMG's] decision" to terminate her employment.

To evaluate discrimination and retaliation claims, California uses the three-part burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*).  (See *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*); *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 708.)  "Under that approach, the employee must establish a prima facie case of unlawful discrimination or retaliation.  (*McDonnell Douglas*, [411 U.S.] at p. 802.)  Next, the employer bears the burden of articulating a legitimate reason for taking the challenged adverse employment action.  (*Ibid.*)  Finally, the burden shifts back to the employee to demonstrate that the employer's proffered legitimate reason is a pretext for discrimination or retaliation.  (*Id.* at p. 804.)" (*Lawson, supra*, 12 Cal.5th at p. 708.)

"A defendant employer's motion for summary judgment slightly modifies the order of these showings.  If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination.  [Citations.]  To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred." (*Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097-1098; accord, *Wilkin v. Community Hospital of the Monterey Peninsula* (2021) 71 Cal.App.5th 806, 821-822.)

Thus, the employee must "produce 'substantial evidence that the employer's stated nondiscriminatory reason for the

adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.'" (*Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003 (*Hicks*).) "The plaintiff must do more than raise the inference that the employer's asserted reason is false. '[A] reason cannot be proved to be "a pretext for discrimination" unless it is shown both that the reason was false, and that discrimination was the real reason.' [Citation.] If plaintiff produces no evidence from which a reasonable factfinder could infer that the employer's true reason was discriminatory, the employer is entitled to summary judgment." (*Ibid.*)

2. *No evidence of pretext*

Ransford challenges the court's ruling only as to the final step of the analysis. She states, "The issue in this appeal boils down to pretext, i.e., was there a legitimate reason for Ms. Ransford's termination, or was her medical condition or use of medical leave at least a factor in her termination[?]" Ransford argues that pretext may be inferred from (1) factual inconsistencies regarding the February 7 incident, (2) the temporal proximity between her return from medical leave and the January 2017 corrective action, and (3) the vague and subjective nature of the various criticisms about Ransford's work performance.

The evidence does not support Ransford's argument. She presented no direct evidence that SCPMG's actions resulted from discrimination or retaliation. Indeed, Ransford herself testified that she did not feel that she was treated differently because of any disability. She also testified, "I don't believe they terminated

15

me because they didn't like me or like the way I worked. I believe they terminated me for accusing me of a mistake, a medication error, and putting a patient at risk . . . ."

That Ransford disagrees with Idos's version of the February 7 events does not establish that the incident was pretextual.  Ransford argues that the February 7 incident as a reason for her termination is "simply not supported by the evidence."  She asserts that Idos's instructions said nothing about the dose of medication for February 7, and stated only that the patient should not take the medication on February 8 and 9; Ransford contends that she simply conveyed this information to the patient.  Ransford also asserts that Idos's version of events is inconsistent about who called the patient and when.

"In demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, "'[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . .'"" (*Zamora v. Security Industry Specialists, Inc*. (2021) 71 Cal.App.5th 1, 32; see also *Guz, supra*, 24 Cal.4th at p. 358 [an employer's nondiscriminatory "true reasons" for terminating an employee "need not necessarily have been wise or correct"; "the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*"].)  Here, inconsistencies in the evidence do not support a finding that the basis for termination was pretextual.  SCPMG submitted evidence that Ransford had a long history of concerning behavior, especially surrounding her communication with patients and staff.  SCPMG asserted that beginning in 2015, Ransford did not mark important messages

16

"urgent," moved or canceled patient appointments without notifying the patients, gave a patient incorrect medication instructions, refused to communicate patient information that was written down in another room, and failed to meet expectations regarding rooming patients. In addition, Ransford did not dispute that she rolled her eyes at team members who gave her instructions, and complained that she was being micromanaged when she was asked to better document how she reached patients by phone.

Thus, the February 7 incident occurred after concerns had already arisen about Ransford's ability to effectively communicate. Idos and Goldberg questioned Ransford's actions that day regardless of the exact medication instructions, what Ransford told the patient's wife, or who called whom. Idos stated that when she confronted Ransford about the call an hour after it occurred, Ransford became defensive and claimed she did not recall what she told the patient, which Idos found "not credible." Goldberg stated in her declaration that when she discussed the issue with Ransford a week later, she also found Ransford's lack of memory about the incident not credible. Goldberg stated that this was one incident among a "continued pattern of lack of good judgment." "[T]he loss of confidence in an employee . . . is a legitimate, nondiscriminatory reason for discharge." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 352 (*Arteaga*).) Thus, even assuming Ransford's version of events was correct, the minor inconsistencies in the evidence regarding the events on February 7 do not suggest that the basis for Ransford's termination was pretextual or otherwise motivated by discriminatory animus.

17

Ransford asserts that the "evidence of pretext is further augmented by the temporal proximity (less than a week) between Ms. Ransford's return from medical leave and [the] Level 4 Corrective Action." SCPMG points out that Ransford's claim is for wrongful termination—she did not allege in her complaint that she was subjected to discriminatory or retaliatory adverse employment action other than termination. Thus, the only relevant adverse event is Ransford's termination, not the Level 4 Corrective Action.

Even assuming the timing of the Level 4 Corrective Action was relevant, however, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination." (*Arteaga, supra*, 163 Cal.App.4th at p. 353.) The *Arteaga* court continued, "This is not to say that temporal proximity is never relevant in the final step of the *McDonnell Douglas* test. In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity—disclosing a disability—is suddenly accused of serious performance problems, subjected to derogatory comments about the protected activity, and terminated. In those circumstances, temporal proximity, together with the other evidence, may be sufficient to establish pretext." (*Id.* at pp. 353-354.)

Ransford's situation was not similar. SCPMG's concerns about Ransford's communication with staff and patients dated back to 2015, before she went on leave. Moreover, Ransford did not submit any evidence suggesting that SCPMG considered Ransford's leaves or medical issues to be problematic. Temporal

18

proximity, without more, does not support a finding of pretext or discriminatory animus.

Ransford further contends that because SCPMG's criticisms of her performance were "subjective," they support an inference of pretext. She asserts that "[i]n light of the weakness and implausibilities [*sic*] in SCPMG's evidence" regarding the February 7 incident, "a trier of fact could reasonably infer that inclusion of such subjective incidents in the Level 4 Corrective Action is also pretextual."

Although subjective evaluations are "'susceptible of abuse and more likely to mask pretext'" (*Xin Liu v. Amway Corp.* (9th Cir. 2003) 347 F.3d 1125, 1136), the evidence does not suggest as much here. For one thing, Ransford observes in her brief that the "subjective" comments were "criticisms of Ms. Ransford *prior* to her taking extended medical leaves." (Emphasis added.) The criticisms therefore could not have been made in retaliation for her back injury or medical leaves. Ransford does not dispute that that she met with Goldberg and Flores in July 2015—before she went on leave—to discuss needed improvements in her work. Moreover, the criticisms did not involve amorphous qualities, such as whether Ransford was sufficiently "upbeat." (*Xin Liu, supra*, 347 F.3d at p. 1137.) To the contrary, almost all of the incidents in the Level 4 Corrective Action related to specific interactions involving communication among staff or with patients. These criticisms do not suggest pretext. "The fact that [an] assessment was based upon subjective criteria does not, by itself, demonstrate pretext." (*Hicks, supra,* 160 Cal.App.4th at p. 1005.)

Thus, SCPMG established nondiscriminatory reasons for Ransford's discharge, and Ransford did not produce evidence that

19

would permit a trier of fact to find that intentional discrimination occurred.  Summary judgment on Ransford's wrongful termination cause of action was appropriately granted.

## B.    Emotional distress

Ransford asserts that the court also erred in granting summary judgment on her intentional and negligent infliction of emotional distress causes of action based on workers' compensation exclusivity.  She asserts, "the trial court failed to take into consideration the law that a claim for emotional distress is not barred where the distress is caused by an employer's illegal discriminatory practices."

Generally, when a plaintiff employee alleges infliction of emotional distress, and the "alleged wrongful conduct . . . occurred at the worksite, in the normal course of the employer-employee relationship, . . . workers' compensation is [the] exclusive remedy for any injury that may have resulted." (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 902.)  "However, where a plaintiff can allege that she suffered emotional distress because of a pattern of continuing violations that were discriminatory, her cause of action for infliction of emotional distress will not be barred by the exclusivity provisions of workers' compensation laws."  (*Murray v. Oceanside Unified School Dist.* (2000) 79 Cal.App.4th 1338, 1363.)

Here, there were no triable issues of material fact as to discrimination in relation to Ransford's wrongful termination claim, and the emotional distress causes of action fail for the same reasons.  Ransford did not show that she suffered emotional distress due to a pattern of discriminatory violations.  We therefore find no error in the trial court's ruling as to Ransford's

20

claims for negligent and intentional infliction of emotional distress.

## C.    Wage claims

Ransford contends the trial court erred in granting summary judgment on her wage-based claims on the grounds that she failed to comply with the requirements of the CBA. She asserts that she "showed that she did initiate the grievance process through an informal process, as required by the CBA." However, the CBA requires that a grievance "be initiated . . . by the submittal of a grievance form from the union to facility human resources and copied to the involved supervisor." Ransford only cites evidence that she left voicemails for Flores about the issue; there is no evidence that she filed a grievance form with human resources or her supervisor. Moreover, Ransford's counsel acknowledged at the motion hearing that Ransford did not file a grievance. Ransford therefore failed to demonstrate that she followed CBA requirements, or that the court's conclusion as to this issue was erroneous.[2]

---

[2]    The trial court did not hold that Ransford failed to get proper approval before she took bereavement leave. Nevertheless, in her brief Ransford discusses the manner by which she initially requested leave (by phone rather than through the computer system), and argues this procedure was appropriate. These contentions are irrelevant. Ransford's counsel asserted for the first time at oral argument that Ransford was entitled to bereavement pay pursuant to statute, without regard to any CBA requirements. This argument was not included in Ransford's briefing, and it has been forfeited.

# DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


CURREY, J.


22