Filed 6/24/15  Williams v. Kaiser Permanente CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LENA WILLIAMS, | B255581 |
| Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. BC499263) |
| KAISER PERMANENTE et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.

Law Offices of Gloria Dredd Haney and Gloria Dredd Haney for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton and Thomas R. Kaufman for Defendants and Respondents.

Plaintiff Lena Williams appeals from a summary judgment entered in favor of defendants Kaiser Foundation Hospital (Kaiser, erroneously sued as Kaiser Permanente), Arlene Zepeda, Schola Ogomaka, and Felipe Garcia in her employment-related lawsuit alleging claims for defamation, discrimination, retaliation, harassment, and failure to prevent discrimination. In granting defendants' motion for summary judgment, the trial court found, among other things, that Williams failed to establish a prima facie case of defamation, failed to show a connection between the alleged adverse employment action and any protected category or activity under the Fair Employment and Housing Act (FEHA), and failed to present evidence that any harassment she suffered was based upon her race or medical condition. Upon our review of the record, we conclude the trial court was correct. Accordingly, we affirm the judgment.

## BACKGROUND

Williams is a registered nurse. She began working as a nurse at Kaiser's Baldwin Park Medical Center in May 1999. In September 2006 she resigned from her position after she was diagnosed with breast cancer. A little more than a year later, after treatment for her cancer, she returned to work at Kaiser. When Williams first worked at Kaiser, she worked in the intensive care unit (ICU); when she returned, she worked in the step down unit (SDU).

A.    *Reports Are Made Regarding Williams' Conduct*

On May 8, 2010, a charge nurse in the SDU, Maribeth Ramirez, contacted Martha Lopez, the Assistant Clinical Director of Medical/Surgical/Telemetry, regarding an incident involving a patient in the SDU. Lopez was called to the SDU to speak with the patient's daughter (Julie) and her husband. Julie told Lopez that when she and her husband walked into the SDU that morning, they heard

2

someone screaming. As they got closer to Julie's mother's room, they realized it was her mother who was screaming. Julie went to the desk to ask for help, and was told by the secretary that the nurse assigned to her mother was busy with another patient. Julie's husband asked a physician who was at the nurses' station if he had heard the screaming. The doctor said that he had, but it was not his patient. Julie's husband told Lopez that Williams, who also was at the nurses' station, ignored the entire situation. Lopez spoke to Williams, who said she was busy with her patient; she also said she had heard the screams, but thought the patient was just confused. Later that day, Lopez reported the incident by email to Ogomaka (Williams' direct supervisor) and Yvonne Sturm (a Kaiser employee whose position is not disclosed in the record).[1]

The next day, Lopez sent another email to Ogomaka, Sturm, and other Kaiser employees to report another incident involving Williams. She wrote that Williams was trying to help a co-worker but ended up upsetting a patient and the patient's family. Lopez explained that SDU nurse Yung had taken one of his patients to X-ray. Another of his patients needed a new IV, and Williams went into that patient's room to start a new line. She opened everything she needed, and just as she was going to insert the IV, the patient started coughing. Williams turned and left the room, leaving all of the open supplies by the patient's bed. When Yung returned to the patient's room, the patient and her family told him what had happened. Lopez reported that there were "a lot of issues in SDU right now and the staff is complaining about [Williams]." She noted that Ramirez would "also write what she knows" about the incident.

---

[1] The record also contains a handwritten note (dated May 8, 2010) from Ramirez to Lopez describing the incident.

In Ramirez's handwritten report, Ramirez recounted what the patient's husband told her about the incident, and said the patient's daughters expressed concern about Williams leaving the IV tray with needles and syringes in the room. Ramirez also reported that when she asked each of the SDU nurses if Williams had asked any of them to insert an IV, each of them said that she had not. Finally, Ramirez reported that nurse Yung told her that he had looked for Williams and found her sleeping in the break room.

A month later, in June 2010, Ramirez reported that another patient had complained about Williams. Ramirez wrote that, according to the patient's daughter, Williams yelled at the patient and was very rough with her. The daughter said that the patient was afraid to be alone with Williams. She also said that Williams ignored the patient's request for pain medication until she (the daughter) insisted that she be given the medication.

B.    *Williams Complains to Management Regarding Her Co-Workers*

In or around August 2010, Williams filed a formal complaint with Kaiser's Human Resources department regarding her treatment by the other nurses in the SDU. She subsequently met with defendant Zepeda, a Senior Human Resources Consultant at Kaiser, to discuss her concerns. Williams told Zepeda that she was the only Black American nurse in the SDU,[2] and that 95 percent of the other nurses assigned to the SDU, including the charge nurse, were Filipino. She said that the other nurses told patients to make false statements about Williams' patient care, and repeatedly told Williams that she did not properly care for her patients and that

---

[2]    Kaiser produced evidence in reply to Williams' opposition to the summary judgment motion that, in fact, there were two other Black/African American nurses working in the SDU at the time of the meeting. In addition, defendant Ogomaka, who was Williams' direct supervisor in the SDU, was a Black African.

4

they were going to get her fired. She also told Zepeda that Ogomaka told her that the other nurses referred to Williams as "evil," and said that Williams "had an attitude."

A week later, Williams met again with Zepeda and Steve Garcia, the clinical director of the SDU at the time. At that meeting, Williams told Zepeda and Garcia that Antonio Ruvalcaba, the night charge nurse, was auditing Williams' charts to try to find errors. She described an incident in which Ruvalcaba reprimanded her for one such error in front of other staff and shouted that she should be written up and fired. Williams also said that she had heard that Ruvalcaba carried a knife and a sharpener with him; she said she was concerned for her safety.

Several months later, on February 27, 2011, Williams wrote a memo to Ogomaka complaining about how another incident was handled. She explained that on February 12, 2011, she had made two attempts to start an IV on one of her assigned patients. After both attempts failed, another nurse, Rowena Santos, successfully started a line in the patient's hand. However, the patient complained that the IV was painful, so Williams removed it. The patient asked that laboratory personnel start a new IV, but Williams told him that a registered nurse must do it. Ramirez, the charge nurse, spoke with the patient, who demanded to speak with the house supervisor. Before Ramirez or the house supervisor spoke to Williams, the patient was assigned to a different nurse. In her memo to Ogomaka, Williams complained that Ramirez and the house supervisor should have talked to her and conducted a more thorough investigation; she contended that the patient's discomfort was the fault of Santos, and that Williams should not have been blamed for the incident.

5

C.    *Another Incident Leads to Williams' Suspension*

The final incident involving Williams occurred on July 30, 2011. That morning, the night shift reported to Williams that a diabetic patient assigned to her had been hyperglycemic with a blood sugar of 342, and had been given 12 units of insulin. When Williams did her initial assessment of the patient that morning, the patient's level of consciousness was her normal baseline, but when she checked again shortly before noon, her level of consciousness was altered. Williams checked the patient's blood sugar level with a glucometer; the glucometer reading was "lo" or "critically low." Williams went to the break room to ask for assistance from other nurses; none of them responded. She then went to the computer to order laboratory tests for the patient, and called the attending physician to report the patient's low glucose reading and altered level of consciousness. As she was heading to the medication room to get a medication, D-50, to administer to the diabetic patient, she passed by the room of her other assigned patient and noticed that he was trying to get out of his bed, was swaying back and forth, and had defecated on the floor. She grabbed him, cleaned him up, and put him back to bed, and then went to get the D-50 for the diabetic patient. She administered the medication at 1:19 p.m., more than an hour after she recorded the low blood sugar reading. At that time, she saw that the patient's saturation level was 86 and the patient was unresponsive. Williams notified the doctor, who said he could not be there for an hour. Williams then notified the respiratory therapist. The patient was intubated and transferred to the ICU; Kaiser was unable to revive the patient, and she died shortly thereafter.

Zepeda was informed of this incident by Felipe Garcia (who was the manager of the SDU at that time) on August 8, 2011. Garcia expressed concern that Williams' conduct represented a "serious lapse in patient care" and likely contributed to the patient's death. It is Kaiser's normal practice, once it becomes

6

aware of serious patient care issues related to an employee, to place the employee on paid investigatory suspension while the facts regarding the incident are gathered. Zepeda concluded that Williams' actions were serious enough to warrant placing her on paid investigatory suspension until it could be determined whether her conduct warranted discipline.

Williams was placed on paid investigatory suspension on or around August 12, 2011.

Zepeda, Ogomaka, and Felipe Garcia began the investigation into Williams' conduct by interviewing Williams and other nurses who were on staff on the day of the incident. Garcia interviewed Williams on August 15, 2011; Zepeda and Ogomaka attended the interview, and Zepeda documented Williams' responses to Garcia's questions. At that interview, Williams admitted that she had not noticed a standing order in the Kaiser Health Connect system that if the patient is found to have low blood sugar she is to be administered D-50 immediately.[3] Williams told Garcia that she wanted to have the lab draw blood to verify the patient's blood sugar level before she administered the D-50, but she admitted she mistakenly ordered the lab "routine" rather than "stat" (i.e., expedited) and did not get the results until after 3:00 p.m., two hours after she administered the D-50.

Based upon Williams' interview responses, Kaiser decided to continue the investigation, and kept Williams on paid investigatory suspension. While on investigatory suspension, Williams was paid for all the hours she normally worked

---

[3] Williams testified at her deposition that it did not matter whether she had seen the order because she knew that if a patient had low blood sugar, D-50 should be administered.

(24 hours per week) and continued to receive pay increases under the collective bargaining agreement.[4]

D.    *Williams is the Subject of Another Investigation*

In December 2011, Kaiser received an anonymous complaint that Williams had shared with other nurses and an attorney the medical records of the patient at issue in the investigation for which Williams was suspended. Kaiser conducted an investigation into that complaint. As part of the investigation, Williams was interviewed by a Kaiser compliance officer; also present at the interview were Zepeda and union representatives. Williams denied printing out the patient's medical records and taking them off site, but she admitted sharing information "hypothetically with multiple people," without using names.

E.    *Williams Files Complaints With DFEH and Superior Court*

On January 16, 2012, Williams filed a complaint of discrimination with the California Department of Fair Employment and Housing (DFEH). She alleged that she was suspended on August 12, 2011 "because of my race/color black, because I complained about the continuous harassment I experienced from the Phillipino [*sic*] nurses in particular, and because I complained about patient abuse/substandard care." Specifically, she alleged that in 2010 she complained to human resources about her hostile work environment in which she constantly was told she would be fired and other "Phillipino" nurses were going to be hired to

---

[4]    Williams was still on paid investigatory suspension at Kaiser at the time of the hearing on the summary judgment motion in January 2014. Both before and during the suspension, Williams also worked 36 hours per week at St. Francis Medical Center, and also worked additional hours at different hospitals through the St. Francis Medical Center Certified Nurse Registry.

replace her, and complained that she was being set up and falsely accused of endangering the safety and well being of patients. She alleged that in February 2011 she twice complained to the manager of the SDU about other nurses giving substandard patient care, one by leaving in a painful IV, and the other by failing to notice that "'there was a leak in [a] patient['s] feeding tube to the trach.'" She alleged that "[a]fter my complaints, I was put on suspension so that human resources could engage in a so-called 'investigation,'" and was replaced by a less qualified and much younger employee.

Williams requested, and obtained, an immediate right-to-sue notice from DFEH on January 16, 2012. She filed the complaint in the instant action exactly a year later, on January 16, 2013. The complaint -- a form complaint -- included attached causes of action for defamation, race discrimination, disability discrimination, disability harassment/retaliation, age discrimination, harassment, failure to prevent discrimination, FEHA retaliation, emotional distress, and "medical condition." The description of the reasons for liability was identical for each cause of action, and was virtually identical to the complaint Williams filed with the DFEH.

F.      *Defendants' Motion for Summary Judgment/Adjudication and Ruling*

In October 2013, defendants filed a motion for summary judgment or, in the alternative, summary adjudication of each cause of action. The motion was heard on January 6, 2014, and on March 11, 2014 the court issued its order granting the motion, finding there was no triable issue of material fact as to any of Williams' causes of action and that defendants were entitled to judgment as a matter of law. Specifically, the trial court found: (1) Williams failed to establish a prima facie case of defamation; (2) although a jury reasonably could conclude that Williams' paid suspension was an adverse employment action, Williams' claims for

9

discrimination and retaliation failed because Williams failed to produce any evidence to show a connection between the suspension and any protected FEHA category; (3) Williams failed to establish a prima facie case of discrimination; (4) "Kaiser had legitimate, non-discriminatory reasons for placing [Williams] on paid investigatory leave (i.e., her patient died and she admitted to failing to follow a doctor's order and failing to order a lab test be performed on an expedited basis)"; (5) there is no evidence of a connection between Williams' protected activity and any actionable mistreatment she suffered; (6) Williams failed to produce evidence of severe or pervasive harassment on account of race or medical condition; (7) Williams' claim for failure to prevent discrimination fails because her underlying claims of discrimination fail; (8) Williams failed to produce evidence that the individual defendants engaged in any conduct that could support individual liability; and (9) Williams failed to produce evidence that the individual defendants or any managing agent of Kaiser engaged in malicious, oppressive, or fraudulent misconduct directed at her or ratified the same.

Judgment was entered in favor of defendants, from which Williams timely filed a notice of appeal.

## DISCUSSION

On appeal, Williams contends the trial court erred in granting summary judgment because there are triable issues of material fact. Although there may have been some disputed facts, the court did not err in granting the motion because Williams failed to present evidence from which a reasonable jury could conclude that (1) any of the defendants published, or was responsible for publishing, a defamatory statement about her; (2) in placing Williams on investigatory suspension, Kaiser or the individual defendants acted with a motive to discriminate; (3) there was a causal connection between Williams submitting

10

complaints regarding her co-workers and being placed on suspension; or (4) Williams was harassed on account of her race, age, or medical condition. In other words, the record shows that Williams could not establish at least one element in each of her claims.

A.     *Summary Judgment Standard*

In the trial court, a defendant moving for summary judgment must present evidence that one or more elements of the plaintiff's claim cannot be established or that there is a complete defense to the claim. If the defendant meets that burden of production, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that claim or defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) The plaintiff shows that a triable issue of material fact exists by pointing to evidence that would allow a reasonable trier of fact to find that fact in favor of the plaintiff. (*Ibid.*) If the plaintiff fails to do so, the defendant is entitled to judgment as a matter of law.

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) We make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222.)

11

B.      *Defamation Claim*

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' [Citation.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) A defendant may be held liable for defamation only if that defendant "'takes a *responsible* part in the publication.'" (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 549.)

Defendants argued in their motion for summary judgment that they were entitled to judgment as a matter of law on Williams' defamation claim because there is no evidence of any defamatory statement made by any of the defendants. They pointed to Williams' deposition testimony that the people she alleged mistreated her were the Filipino nurses, none of whom is named as a defendant.[5]

In opposing the summary judgment motion, Williams did not produce any evidence of defamatory statements made by any of the defendants. Instead, she argued in her points and authorities – and repeats verbatim in her opening brief – that although her defamation claim is based upon accusations made by her co-workers regarding her alleged "negligence, incompetence, and lack of patient care," defendants "encouraged and invited" her co-workers to get staff and patients to question her competence and "encouraged and tolerated" the alleged false statements about her. She did not, however, produce any evidence to support her assertion that defendants had any involvement in the publication of those

---

[5]      At her deposition, Williams was asked, "Who are the people who work at Kaiser who you believe mistreated you that is the subject of this lawsuit?" She answered, "Filipinos." Counsel asked, "All Filipinos?" She answered, "The majority." When asked if there was anyone other than the Filipinos, she responded "No." She then was asked if there was anyone in particular who mistreated her. After identifying one nurse by name, Williams said, "And then all of them. They stick together like the rice they eat."

12

accusations.  In short, she failed to raise a disputed issue of fact regarding whether defendants were responsible for the allegedly defamatory statements.  Therefore, the trial court properly found that defendants were entitled to judgment as a matter of law on the defamation claim.

C.     *Discrimination Claims*

In analyzing employment discrimination claims, California courts apply the three-stage burden shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.  (*Guz*, *supra*, 24 Cal.4th at p. 354.)  Under that test, the plaintiff has the initial burden to establish a prima facie case of discrimination.  "Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, . . . and (4) some other circumstance suggests discriminatory motive." (*Id.* at p. 355.)  If the plaintiff satisfies this initial burden, a presumption of discrimination arises and "the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason." (*Id.* at pp. 355-356.)  "If the employer sustains this burden, the presumption of discrimination disappears. [Citations.]  The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.  [Citations.]  In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias.  [Citations.]  The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff.  [Citations.]" (*Id.* at p. 356.)

On a summary judgment motion in an employment discrimination case, "the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors. [Citations.] [¶] In meeting its initial burden the employer need not rely upon the premise that the plaintiff cannot demonstrate a prima facie case if the employer can set forth admissible evidence of its reasons, unrelated to unlawful discrimination, for the adverse employment action. [Citation.] If the employer meets its initial burden in this manner, the plaintiff then has the burden to produce 'substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.] [¶] The plaintiff must do more than raise the inference that the employer's asserted reason is false. '[A] reason cannot be proved to be "a pretext *for discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.' [Citation.] If plaintiff produces *no* evidence from which a reasonable fact finder could infer that the employer's true reason was discriminatory, the employer is entitled to summary judgment. [Citation.]" (*Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003.)

In their summary judgment motion in this case, defendants contended that Williams could not establish a prima facie case of discrimination, arguing she could not show that being placed on paid investigatory suspension was an adverse employment action. Defendants also argued that even if being placed on paid suspension constituted an adverse employment action, Williams could not prevail on her discrimination claims because Kaiser acted for a legitimate,

14

nondiscriminatory reason, i.e., to protect patient safety while it investigated Williams' conduct that may have contributed to a patient's death, and there was no evidence of a discriminatory motive.

Defendants supported their first argument with excerpts from Williams' deposition and various tax forms showing that Williams was paid by Kaiser her normal rate of pay (and was given pay raises) during the time she was on suspension, and that her total income increased during the suspension because she was able to increase the number of hours she worked through the St. Francis Medical Center Certified Nurse Registry.

To support their second argument, defendants submitted a declaration from Zepeda, who described how she learned about the July 30, 2011 incident (the SDU manager expressed concerns about a serious lapse in patient care by Williams), why Williams was placed on investigatory suspension (Kaiser's normal practice when it learns of serious patient care issues is to place the employee on paid suspension while it investigates the matter), and what Williams admitted during her August 15, 2011 interview (she had not noticed a standing order and she failed to order lab tests on an expedited basis). Zepeda also declared that Kaiser's motivation for placing Williams on paid investigatory suspension was to protect patient safety.

Defendants also submitted several excerpts from Williams' deposition. Those excerpts included Williams' testimony regarding the July 30, 2011 incident and her acknowledgement of admissions in her August 2012 interview. In addition, defendants submitted an excerpt in which Williams was asked if she ever heard anyone at Kaiser make any racial comments. Williams responded by referring to two nurses who told her that they wanted her out. When asked if there were any other examples of racial comments, Williams said, "I'm sure they made

15

it, but I didn't hear any, because they talk in [Tagalog]," which Williams did not understand.

In opposition to defendants' motion, Williams contended that Kaiser's explanation for her suspension was pretext for discrimination because there was no reason to believe that Williams' conduct on July 30, 2011 led to the patient's death.[6] She submitted declarations from several medical providers in an attempt to show that her conduct did not contribute to the patient's death, but the trial court sustained defendants' objections to the substantive portions of those declarations.[7] She also submitted an August 9, 2011 email from Kaiser's inpatient pharmacy supervisor, who concluded that it was difficult to determine whether the patient "bottomed out because of the insulin [she was] given."

On appeal, Williams repeats her contention, arguing that "Kaiser knows there is nothing about [Williams'] conduct on July 30, 2011, which Kaiser or its agents believe led to the patient's death." Williams' contention suffers from two infirmities.

First, whether Williams' conduct *actually* led to a patient's death is not material. What is material is whether the reason defendants proffered for placing Williams on investigatory suspension was legitimate. In light of the evidence presented by defendants -- Williams' admission that she was unaware of a standing

---

[6] Williams also argued that her suspension constituted an adverse employment action, and the trial court agreed that a reasonable fact finder could find that it was. We need not address this argument or ruling in light of our conclusion that Williams failed to present sufficient evidence to show that Kaiser's proffered reason for placing her on suspension was a pretext for discrimination.

[7] Because Williams did not challenge in her appellant's opening brief the trial court's evidentiary rulings regarding the medical professionals' declarations or the court's ruling sustaining objections to parts of her own declaration, we do not consider those portions of the declarations to which defendants' objections were sustained. (*Guz*, *supra*, 24 Cal.4th at p. 334.)

order to administer D-50 if the patient's blood sugar level was low, and that she failed to ask for the lab tests she requested to confirm the low blood sugar level reading to be done on an expedited basis, and Zepeda's declaration that Williams was placed on suspension out of concern for patient safety -- Williams' speculation that Kaiser did not believe that Williams' conduct contributed to the patient's death is not sufficient to raise a disputed issue of material fact. (See *Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196 ["An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work'"].)

Second, even if Williams had shown that defendants' proffered reason was false, "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions. [Citation.]" (*Guz, supra,* 24 Cal.4th at pp. 360-361.)

Although Williams argues in her appellant's opening brief that there was evidence of disparate treatment that shows a discriminatory motive, the evidence is insufficient to support an inference of discrimination. First, she cites to evidence that a Filipino nurse was fired and then got her job back. But that evidence is Williams' own deposition testimony, in which she admitted that she did not know the nurse's name or why she was allowed to returned to work. Without evidence of the circumstances of that nurse's alleged firing or the reasons for her return, no reasonable fact finder could conclude that Williams was treated differently because

17

of her race, age, or medical condition.  Second, Williams cites to the May 8, 2010 incident reported by Ramirez, in which Williams ignored a patient's screams and the patient's daughter's request for assistance.  Williams contends that in that incident a doctor and another nurse also "purportedly treated a patient in an unacceptable manner, but only Williams received the write up and complaint."  Even if it were true that only Williams received a "write up and complaint" (we note that the other parties involved were named in Ramirez's report, and no evidence was presented as to whether copies of the email were also placed in their personnel files), it would not establish that Williams was treated differently than similarly situated employees.  Unlike Williams, the other parties involved in the incident -- Dr. Gutierrez and Annette Jones -- were not nurses (Williams testified at her deposition that Annette was a secretary in the SDU).

In short, Williams failed to present sufficient evidence to raise a reasonable inference that Kaiser's true reason for placing her on suspension was discriminatory.  Therefore, the trial court correctly found that defendants were entitled to judgment as a matter of law on Williams' discrimination claims.  (*Hicks v. KNTV Television, Inc.*, *supra*, 160 Cal.App.4th at p. 1003.)


D.    *Retaliation Claims*

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) that the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.  [Citations.]  Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action.  [Citation.]  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts

18

back to the employee to prove intentional retaliation.  [Citation.]"  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

In moving for summary adjudication of Williams' retaliation claims, defendants argued that Williams was not subjected to an adverse employment action and she could not show a causal link between her protected activity (filing complaints about the Filipino nurses' treatment of her) and her suspension.  In her opposition to the motion, Williams argued that her suspension constituted an adverse action, and that she met her burden on summary judgment by producing evidence that she engaged in protected activity by complaining about her co-workers' treatment of her and that she was "forced from her job."  She did not address the one-year gap between her complaints to human resources and her suspension.

On appeal, Williams argues that "a lengthy period between protected activity and adverse action is not necessarily fatal to [Williams'] prima facie case.  '[I]f between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection.'"  (Citing *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 421 (*Wysinger*).)  Williams' citation to *Wysinger* does not assist her here.  In that case, the plaintiff presented evidence at trial that his employer engaged in a pattern of conduct consistent with retaliatory intent beginning immediately after he filed an age discrimination claim (the protected activity) and continuing for several years, culminating in the denial of a promotion for which he had been recommended (the adverse action).  (*Id.* at pp. 418-419.)  In the present case, Williams presented no evidence that defendants' (or her co-workers') conduct changed after she made her complaints.

Moreover, as discussed in section C., *ante*, defendants proffered a legitimate reason for placing Williams on suspension -- which shifted the burden to Williams

to prove intentional retaliation (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1042) -- and Williams failed to produce any evidence that the real reason for her suspension was retaliation.  Therefore, the trial court properly granted defendants' summary judgment motion as to Williams' retaliation claims.


E.      *Harassment Claim*

"Government Code section 12940, subdivision (j), defines 'unlawful employment practice' to include harassment in the workplace based on national origin, sex, . . . age[, race, or medical condition].  'Under the statute "harassment" in the workplace can take the form of "discriminatory intimidation, ridicule and insult" that is ""'"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'"" [Citations.]'"  (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 869.) "The statutory scheme requires an employer to take all reasonable steps to prevent harassment from occurring in the workplace and to take immediate and appropriate action when it is or should be aware that harassment has occurred."  (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1376.)

In their summary judgment motion in this case, defendants contended they were entitled to judgment on Williams' harassment claim because there was no evidence that she was subjected to harassment based upon her race, age, or medical condition, and because the alleged harassment was not so severe or pervasive to constitute actionable harassment.  They supported their contention regarding the severity of the alleged harassment with excerpts from Williams' deposition.  In those excerpts, Williams was asked to identify specific instances of mistreatment, and she identified two.  One arose after she discovered that a patient's feeding tube was leaking into the patient's "trach," and she called Ogomaka into the patient's room to show her.  The patient was transferred from the SDU to the ICU, and the

20

following day some "Filipino nurses in the ICU" reported to Ogomaka that Williams had given the patient a deep tissue injury, which Williams testified was not true. The second instance of mistreatment Williams identified was the incident involving the patient who had a painful IV that Williams removed; Williams testified that the Filipino nurses tried to write her up and accuse her of being the cause of the patient's agitation, but she contended the agitation was caused by the nurse who inserted the painful IV and left it in. When asked if she could identify any other incidents in which the Filipino nurses mistreated her, Williams testified, "They were just mean to me. My mom passed, and they didn't even give me a card or anything."

In opposing the summary judgment motion, Williams asserted that the alleged harassment was not limited to those incidents, and cited her deposition testimony in which she stated, "it was multiple incidents." She did not, however, produce any evidence that any of the alleged harassment was based upon a protected characteristic. In her appellant's opening brief, she simply states, without any citation to the record, "It must be noted Plaintiff was not only harassed because of her race but also because of her medical condition, i.e., cancer." Because there is no evidence in the record that any of the conduct Williams alleges constituted harassment was directed at her because of her race, age, or medical condition, the trial court correctly found that defendants were entitled to judgment as a matter of law on her harassment claim. (See, e.g., *Surrell v. California Water Service Co.* (9th Cir. 2008) 518 F.3d 1097, 1109-1110 [affirming summary judgment on harassment claim where plaintiff presented no evidence that alleged harassing comments were based on protected characteristic].)

21

F.      *Failure to Prevent Discrimination Claim*

As defendants noted in their motion for summary judgment, Williams' claim for failure to prevent discrimination is entirely derivative of her discrimination claims. Williams does not dispute this assertion; in fact, she argues in her appellant's opening brief that she should be allowed to proceed to trial on her failure to prevent discrimination claim because she met her burden on her discrimination and harassment claims. Given our conclusion that she did not, in fact, meet her burden on those claims, we conclude that her claim for failure to prevent discrimination necessarily fails, and the trial court properly granted summary judgment on that claim. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 [noting that an employer cannot be held liable for failing to prevent discrimination if the employee cannot establish he was discriminated against or harassed].)

**DISPOSITION**

The judgment is affirmed.  Defendants shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:



EPSTEIN, P. J.



COLLINS, J.