Filed 10/29/15  Kebriaiy v. Union Bank CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| ALI KEBRIAIY,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>UNION BANK, N.A.,<br><br>　　　Defendant and Respondent. | B255324<br><br>(Los Angeles County<br>Super. Ct. No. BC489318) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark V. Mooney, Judge.  Affirmed.

————

　　　Cantor Law and Zachary Cantor for Plaintiff and Appellant.

　　　Blank Rome and Michael L. Ludwig for Defendant and Respondent.

————

Ali Kebriaiy alleged that his former employer, Union Bank, N.A. (the Bank), violated the Fair Employment and Housing Act (FEHA) by failing to promote him and, later, terminating his employment based on his age and disability. The court entered judgment in favor of the Bank after granting the Bank's motion for summary judgment. Kebriaiy appealed. Based on our independent review, we affirm the judgment.

## FACTUAL SUMMARY

1.      *Background*

The Bank hired Kebriaiy in August 2001 as a part-time Customer Service Specialist. He was then 63 years old. During his 10 years with the Bank, Kebriaiy received various awards and commendations for his work, occasional promotions, and annual increases in pay. In March 2010, the Bank promoted him to the position of "Operations Assistant II," or "Operations Specialist."

Kebriaiy worked in the Bank's Foothill Ranch branch. In December 2010, there was an opening in the Bank's Mission Viejo branch for an Operations Specialist, the same position Kebriaiy held. Kebriaiy applied for the position because the Mission Viejo branch was closer to his home. Brian Skelton, a regional manager for the Bank, denied his application without giving Kebriaiy a clear reason. Kebriaiy believed that Skelton did not like him. When asked why he believed this, Kebriaiy said that Skelton would talk with other employees when he visited the branch, but would not respond when Kebriaiy said hello to him.

In January 2011, Jacqueline Williams became the Customer Service Manager at the Foothill Ranch branch and Kebriaiy's direct supervisor. Curtis Kang was the branch manager.

In March 2011, the Bank received a letter from a lawyer asserting that the Bank had mishandled a series of deposits for the lawyer's client. Kang asked Williams to investigate the claim. Williams determined that Kebriaiy and two other Bank employees had made erroneous transactions. Kebriaiy's error occurred more than a year earlier, in February 2010, when he deposited checks totaling $3,000 into the account of someone other than the payee of the checks. The day after it happened, the error was corrected;

2

neither the Bank nor a customer lost any funds. Kebriaiy's supervisor at the time, "Maggie," orally admonished him to "be careful."

In May 2011, Williams, unaware that her predecessor had spoken to Kebriaiy about the mishandled deposit, prepared a "final written warning[]" to Kebriaiy based on the error. She prepared similar warnings for the other two employees. Williams printed Kebriaiy's written warning on May 25, 2011, but did not give it to him until after she denied him a promotion, as discussed below.

### 2. *Williams Denied Kebriaiy a Promotion*

Around the same time that Williams was preparing the written warnings regarding the mishandled deposits, she was interviewing applicants for the position of Customer Service Officer (CSO) in the Foothill Ranch branch. The duties of a CSO were similar to the duties of an Operations Specialist—the position Kebriaiy then held—except that the CSO had a higher level of signing authority. "Signing authority" refers to the authority the Bank gives an employee to decide whether to place a hold on a deposit. At that time, Kebriaiy had signing authority for deposits up to $25,000. According to Williams, Kebriaiy was not only *authorized* to make decisions up to that amount, but was "expected to make" such decisions.

Despite his decision-making authority, Kebriaiy would, at least one or two times per week, seek second opinions from Williams or Kang (the Foothill Ranch branch manager). Williams said he did so "routinely"; Kang said he did it "often." Williams and Kang thus believed that Kebriaiy was not comfortable with his existing level of signing authority and did not have the required decision-making skills for the CSO position.

Williams noted this issue in Kebriaiy's March 2011 performance review. Although the review was generally positive, Williams wrote that Kebriaiy "'needs to work on his decision making skills. Although he has a signing authority limit, he is not confident in making approvals within that limit.'" Kebriaiy disagreed with this criticism, stating in his deposition that he requested second opinions from others because he did not "want to make [a] problem for [him]self" in the event a customer complained. Kebriaiy

3

also pointed out that neither Williams nor Kang ever told him to stop requesting second opinions and that Skelton testified at his deposition that seeking a second opinion might be appropriate when "there's something about the transaction that you feel is not right . . . ."

No one told Kebriaiy about the opening for the CSO position; he found out about it after he noticed individuals coming into the branch for interviews. When Kebriaiy asked Williams why she did not tell him about the opening, Williams told him he was not qualified for the position. When Kebriaiy asked Williams why he was not qualified, Williams told Kebriaiy he could apply for the position. He did, and Williams arranged for an interview.

After interviewing Kebriaiy and three other candidates in late May 2011, Williams selected Arsalan Vakilian to be the CSO. Vakilian was about 30 years old at the time. Skelton was not involved in the CSO hiring decision. In a declaration supporting the Bank's motion for summary judgment, Williams stated that she did not consider Kebriaiy's "age or mental or physical condition" when making her decision; she did not hire Kebriaiy as the CSO because she did not believe he was qualified for the position.

3. *Williams Gives Kebriaiy the Formal Written Warning and Kebriaiy has a Panic Attack*

On May 31, 2011, five days after Williams interviewed Kebriaiy for the CSO position, Williams gave Kebriaiy the final written warning she had prepared regarding the February 2010 mishandled deposit. Kebriaiy points out several anomalies about the written final warning. First, the 15-month gap between Kebriaiy's error and the written warning is inconsistent with the Bank's practice of giving written warnings close to the date the incident occurred or was discovered. Second, contrary to protocol, Williams did not have the employee relations department review the warning in advance. Third, Williams explained the failure to consult with employee relations by stating that Skelton had agreed to her "course of action"; however, Skelton's approval, if given at all, appears to have been based on the fact that Kang incorrectly informed Skelton that

4

Employee Relations had approved of the warning.[1] After the Bank's Senior Employee Relations Consultant learned that Kebriaiy had been given the warning, she emailed Williams stating that "the level of action taken and the rational" for the action did "not appear" to be consistent with the Bank's guidelines.

Almost immediately after Williams gave Kebriaiy the written warning, Kebriaiy had a panic attack. He experienced anxiety, loss of sleep, chest pains, and numbness in his lip. On June 6, 2011, Kebriaiy provided the Bank with a doctor's note stating that Kebriaiy had chest pain and was advised to rest at home. The Bank placed Kebriaiy on a leave of absence. On June 20, 2011, the Bank received a second doctor's note stating that Kebriaiy had a panic attack and was advised to rest. A few days later, in a note stating that Kebriaiy had been examined for arthritic pain, the doctor released Kebriaiy to return to work on June 27, 2011.

4. *Termination of Kebriaiy's Employment*

In 2011 the Bank implemented a "Branch Optimization Initiative" to make the Bank, in Skelton's words, "become more effective, capture efficiencies[,] and be better positioned to deal with market realities." This "broadly-based initiative . . . involved bringing staffing needs and numbers in line with business requirements." As a result, Skelton needed to eliminate nine "full time equivalent[]" positions from within the 16 branches he managed. Skelton testified that he first learned of the layoffs in August 2011.

To determine which positions to eliminate, Skelton considered "objective criteria," such as the number of transactions a branch handled, whether the number of transactions was increasing or decreasing, and the ratio of employees with signing authority to employees without signing authority. The Foothill Ranch branch, he determined, was a relatively small office with declining transaction volume and staffed with too many

---

[1] When asked at his deposition how he learned that Kebriaiy was getting a final written warning, Skelton answered: "The branch manager [Kang] let me know that they were going to give [Kebriaiy] a final written, and so I said, 'Did you, you know, discuss that with employee relations and they were in agreement.' He said, 'Yes,' and I said, 'Okay.'"

employees with signing authority. The branch, in his view, did not "need a higher paid employee with signing authority to do teller transactions that were declining." So, in September, he "decided to eliminate the Operations Specialist position at the Foothill Ranch branch," i.e., Kebriaiy's position, and "backfill with a less expensive part-time teller." Neither Williams nor Kang were involved in the decision.

In his declaration, Skelton stated that he did not base any action with respect to Kebriaiy's employment, including termination of employment, on Kebriaiy's age, mental condition, or physical condition.

Before Skelton told Kebriaiy of his decision, Kebriaiy went on a vacation to visit family in Iran. After arriving in Iran, Kebriaiy became seriously ill. On October 5, 2011, Kebriaiy sent a note to the Bank from a doctor in Iran stating that Kebriaiy had symptoms that included "vertigo, nausea and digestive problems," and he would need "10 days treatment and rest." On October 15, 2011, the doctor stated that Kebriaiy needed an additional "10 days treatment and rest." On October 26, 2011, a doctor released Kebriaiy "to work without limitation."

While Kebriaiy was in Iran, Skelton told Williams and Kang of the decision to eliminate Kebriaiy's position. Williams subsequently sent Skelton an email expressing her concern that Kebriaiy might "have a panic attack" or heart attack when he is informed of the layoff. She recalled that Kebriaiy was "on disability for 3 weeks due to chest pains when [she] delivered his final warning to him earlier this year."

When Kebriaiy returned to work on October 27, 2011, Skelton informed him that his position would be eliminated effective December 26, 2011. Kebriaiy immediately suffered a panic attack and was transported by ambulance to a hospital. Kebriaiy was 74 years old at that time.

As part of the reorganization initiative, Skelton hired or transferred a teller from another branch to the Foothill Ranch branch to work 20 hours per week at a pay-grade lower than Kebriaiy's. The new teller was in his "early 20s." As of the date of the summary judgment motion, the branch had not hired a new Operations Specialist.

5.    *Procedural Background*

Kebriaiy filed a complaint with the Department of Fair Employment and Housing in June 2012. He immediately requested and promptly received a right to sue letter. He filed his complaint in the Superior Court in July 2012 alleging 11 causes of action. He has abandoned all but the following three: (1) disability discrimination; (2) age discrimination; and (3) wrongful termination in violation of public policy.

The Bank filed its motion for summary judgment in September 2013. The motion was initially set for a hearing on November 22, 2013. On November 4, 2013, Kebriaiy filed motions to compel further responses to discovery. The motion for summary judgment and the discovery motions were heard together on November 27, 2013. After granting the motion for summary judgment, the court declared the discovery motions moot and declined to address them. Judgment was thereafter entered in favor of the Bank.

## DISCUSSION

1.    *FEHA and Summary Judgment*

FEHA prohibits discrimination against persons "in terms, conditions, or privileges of employment" based upon age, physical disability, or mental disability, among other protected classes. (Gov. Code, § 12940, subd. (a).) A plaintiff establishes a prima facie case of discrimination under FEHA by producing evidence that (1) he is a member of a protected class (e.g., is over the age of 40 or has a disability); (2) he was qualified for the position (in the case of a failure to hire or promote) or was performing competently in the position (in the case of termination); (3) he suffered an adverse employment action (e.g., termination, demotion, or denial of an available job); and (4) some other circumstance suggests discriminatory motive. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).) If the employee establishes such a prima facie case, a presumption of discrimination arises. (*Ibid.*) An employer may rebut the presumption by producing admissible evidence that it took the challenged action for a legitimate nondiscriminatory reason. (*Id.* at pp. 355-356.) The plaintiff then has "the opportunity to

7

attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Id.* at p. 356.)

A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 486.) In the context of a FEHA claim, an employer moving for summary judgment has the initial burden of producing evidence that either negates one or more elements of plaintiff's prima facie case or establishes a legitimate nondiscriminatory reason for the adverse employment action. (*Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003 (*Hicks*); *Swanson v. Morongo Unified School District* (2014) 232 Cal.App.4th 954, 966.) A "legitimate" reason is one that is "*facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*." (*Guz*, *supra*, 24 Cal.4th at p. 358.) If the reason is legitimate in this sense, it "need not necessarily have been wise or correct." (*Ibid.*)

If the employer meets its initial burden, "'the plaintiff then has the burden to produce 'substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.]" (*Hicks*, *supra*, at p. 1003; see also *Sandell v. Taylor–Listug, Inc.* (2010) 188 Cal.App.4th 297, 314.) To satisfy this burden, the employee may not "simply deny the credibility of the employer's witnesses or . . . speculate as to discriminatory motive." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 862). Nor is it enough to show that the employer's reasons were unsound, wrong, or mistaken. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.) Rather, the employee "'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation],

8

and hence infer "that the employer did not act for the [the asserted] non-discriminatory reasons." [Citations.]' [Citations.]" (*Ibid.*)

If, "considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory," the employer is entitled to summary judgment. (*Guz*, *supra*, 24 Cal.4th at p. 361.)

"We review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017-1018.)

2.    *The Failure to Promote Kebriaiy to the CSO Position*[2]

Kebriaiy contends that the Bank discriminated against him based on his age when it failed to promote him to the position of CSO in May 2011.[3]  For purposes of his prima facie case, there is no dispute that Kebriaiy is over 40 years old (and therefore within the class of persons protected against age discrimination), that the Bank's failure to promote him was an adverse employment action, and that the Bank hired a

---

[2]    On appeal, the Bank argues that Kebriaiy's failure-to-promote claim is untimely because he did not file his FEHA claim within one year of that decision.  (See Gov. Code, § 12960, subd. (d).)  A potential problem with this argument is that the Bank first raised the FEHA statute of limitations as a ground for summary judgment in its reply memorandum of points and authorities.  Ordinarily, it would be error to grant or affirm summary judgment based on such a belatedly raised ground.  (See *Ramsey v. City of Lake Elsinore* (1990) 220 Cal.App.3d 1530, 1546.)  Kebriaiy, however, does not assert this defect in the Bank's argument and, therefore, has arguably waived it.  Instead, Kebriaiy argues that his failure to promote claim is not barred by the statute of limitations based on the continuing violation doctrine.  (See *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 823.)  In any case, because we hold that summary judgment is appropriate for other reasons, we decline to address these issues.

[3]    Although Kebriaiy appears to allege in his complaint that the denial of his application for the Operations Specialist position at the Mission Viejo branch in 2010 was a violation of FEHA, he does not argue this point in his briefs on appeal.  He has therefore forfeited or abandoned that basis for his claim.  (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177.)

significantly younger person for the position. The parties disagree as to whether Kebriaiy can establish the remaining element of his prima facie case—that he was qualified for the CSO position. Even if there is a triable factual issue as to this element, the Bank has met its initial burden by producing evidence that it had a legitimate nondiscriminatory reason for denying Kebriaiy the CSO position: Kebriaiy lacked sufficient decision-making skills and confidence for the position.

The primary feature distinguishing the CSO position and Kebriaiy's then-current position was the level of signing authority. As Williams indicates, by giving an employee a certain level of signing authority, the Bank not only grants the employee the *authority* to make decisions about the handling of deposits, but also *expects* the employee to make such decisions. Contrary to this expectation, by his own admission Kebriaiy sought out Williams and Kang for second opinions on decisions within his signing authority at least once or twice per week. Kang said he did this "often"; Williams said it occurred "routinely." Kebriaiy's practice of seeking out second opinions, Kang and Williams explained, indicated a lack of the decision-making skills required for the CSO position. Because Kebriaiy "was not comfortable with the lower signing authority he already had," Williams stated, he "was not qualified for the CSO position.

The legitimacy of Williams's reason for not hiring Kebriaiy is supported by the evidence of Williams's written review of Kebriaiy's performance more than two months before Kebriaiy applied for the CSO position. In that review, Williams wrote that Kebriaiy "is not confident in making approvals within [his signing] limit." The reason was not, therefore, expressed for the first time in Williams's and Kang's summary judgment declarations.

Because the Bank's reason for denying Kebriaiy the CSO position is legitimate and nondiscriminatory, Kebriaiy had the burden to produce either substantial evidence that the reason was untrue or pretextual, or that the Bank acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude it engaged in intentional discrimination. Kebriaiy has failed to do so.

Kebriaiy points to Williams's failure to inform Kebriaiy of the opening for the CSO position to show discriminatory animus. But the reason for not hiring Kebriaiy—his lack of decision-making confidence and skills—also explains why Williams did not inform Kebriaiy of the opening: Williams did not believe Kebriaiy was qualified for the position. Failing to inform Kebriaiy of the opening, therefore, is entirely consistent with the reason given for not promoting him.

Kebriaiy next points to his disagreement with Williams's use of the word "routinely" to describe the frequency with which he sought second opinions. He explains that he did so only once or twice weekly, and only when the circumstances required it. Indeed, Skelton stated during his deposition that seeking a second opinion might be appropriate when the transaction does not "feel . . . right" to the employee. The argument, however, suggests only that Williams's judgment about Kebriaiy's practice of seeking second opinions was wrong or mistaken, not that it was a pretext for unlawful discrimination.

Next, Kebriaiy asserts that Williams made her hiring decision before she interviewed Kebriaiy. He relies on: (1) an email confirming that Kebriaiy's interview had been scheduled for May 27, 2011, and (2) an email Williams sent in the afternoon of May 26 stating that she had completed her interviews. Williams explained in a declaration, however, that her interview of Kebriaiy, though initially scheduled for May 27, was moved up to May 26, and that she sent her May 26 email after she completed her interview of Kebriaiy. Kebriaiy does not refute this explanation or point to any evidence that his interview actually took place on May 27.

Kebriaiy also points to the fact that the person hired for the position was 40 years younger than he. Although this fact supports a prima facie case of age discrimination, it does not support an inference that the Bank's stated reason was untrue or pretextual. Kebriaiy also cites the fact that Williams drafted the final written warning around the time she told Kebriaiy he could apply for the CSO position. If the reason for denying Kebriaiy the promotion was that he had made the deposit error in February 2010, then Kebriaiy's argument would have some force. Williams, however, did not rely on

11

Kebriaiy's transactional error in denying him the promotion. Because there is no evidence that the prior mistake had any bearing on Williams's decision, evidence of Williams's written warning about the incident is immaterial.

Kebriaiy further asserts that during his interview he saw a piece of paper with the names of persons selected as candidates for the position that did not include his name, and that Williams, contrary to an email she sent, never actually told Kebriaiy he did not get the promotion. Kebriaiy does not explain, however, how these facts imply pretext or a discriminatory animus.

Finally, Kebriaiy asserts that Williams had asked Kebriaiy when he was going to retire and how old he was. He points to his deposition testimony that Williams had asked him about retirement four or six months before his employment was terminated.[4] Asking an employee about his or her retirement plans does not imply a discriminatory animus.[5] Kebriaiy also testified that others had asked his age, but could not recall anyone in particular, identifying only "[t]hose people working over there." Later in his deposition, Kebriaiy testified that Williams had asked Kebriaiy how old he was and that he answered, "64." This places the conversation sometime around 2001, and therefore immaterial. There is nothing in his deposition to suggest that Williams's question to Kebriaiy about his age occurred around the time she asked him in 2011 about retirement.

The facts raised by Kebriaiy are insufficient to raise a triable issue as to the question of whether the Bank's proffered reason for not hiring Kebriaiy as the CSO was

---

[4]    In response to Williams's question about retiring, Kebriaiy answered, "two years or maybe more if I have good condition and good health."

[5]    During oral argument, Kebriaiy's counsel referred us to *France v. Johnson* (9th Cir. 2015) 795 F.3d 1170, a failure-to-promote, age discrimination case that involved a decisionmaker, Gilbert, who "had repeated retirement discussions" with the plaintiff, despite the plaintiff's "clear indications that he did not want to retire." (*Id.* at p. 1172.) In one conversation, Gilbert commented that if he were in plaintiff's position, "he would retire as soon as possible." (*Ibid.*) The Ninth Circuit held that evidence of the frequency, nature, and timing of these discussions was sufficient to create a triable issue as to pretext. (*Id.* at pp. 1176-1177.) We do not disagree with *France*'s analysis. Our case, however, involved only one alleged inquiry about Kebriaiy's retirement and therefore does not raise the specter of prevarication.

untrue or pretextual, or that the Bank's decision was motivated by a discriminatory animus. The Bank is therefore entitled to summary judgment on that claim.

3. *Termination of Kebriaiy's Employment*

Kebriaiy contends that the Bank violated FEHA by terminating his employment based on his age and his alleged disability. Because Kebriaiy is over 40 years of age, he is within the class of persons protected against age discrimination. (See Gov. Code, § 12926, subd. (b).) He also contends he has a mental or physical disability for purposes of FEHA based on the evidence of his June 2011 panic attack and related chest pains, lip numbness, and fits of crying and insomnia, as well as the illness he suffered while in Iran in October 2011. Even if such conditions do not constitute a disability per se, Kebriaiy points out that FEHA also protects employees who are "regarded or treated" by the employer as having a disability. (See former Gov. Code, § 12926, subds. (i)(4) & (l)(4) [now subds. (j)(4) & (m)(4)].)

Even if we assume that Kebriaiy had (or was regarded as having) either a mental or physical disability and otherwise established the elements of his prima facie case for his unlawful termination claims, the Bank satisfied its initial burden by producing evidence of a legitimate nondiscriminatory reason for the action—Kebriaiy's position was eliminated as part of the Bank's reorganization initiative. According to Skelton, he applied objective criteria to determine which branches would be affected and, within a branch, which positions would be eliminated. Kebriaiy's position was identified because the Foothill Ranch branch had declining transactional volume and more employees with signing authority than it needed. "Age," Skelton declared, "was not a factor." More specifically, Skelton stated that he did not consider Kebriaiy's age and mental and physical condition in making the decision. Consistent with the cost-cutting plan, Skelton hired or transferred a lesser-paid, part-time teller. Thereafter, the branch operated with the same complement of employees and without an Operations Specialist. The reason is legitimate and nondiscriminatory and, therefore, shifted the burden to Kebriaiy to show that the reason is untrue or pretextual, or that the decision was motivated by discriminatory animus.

13

Kebriaiy points to interrogatory responses showing that two tellers, including a "Sr. Teller," were hired in August 2011, shortly before Skelton made his layoff decisions. The same responses, however, show that a Senior Teller who had been with the Bank for four years stopped working at the branch in late July. (The record does not disclose why the teller left the branch.) The Senior Teller Kebriaiy points to was hired approximately three weeks later. The facts thus strongly suggest that Williams hired a Senior Teller in mid-August to fill the position vacated by the departure in July of a Senior Teller; there was no net increase in staffing as a result.

The hiring or transfer of the second, part-time teller is entirely consistent with Skelton's explanation that the Bank needed to reduce the number of full-time employees and that the Foothill Ranch branch had more employees with signing authority than needed. The Operation Specialist position (a position with signing authority) was eliminated and a part-time teller was added. The effect was a reduction in the branch's full-time staff.

Contrary to Skelton's testimony that he was notified about layoffs in August 2011 and that he told Kang and Williams of the layoffs in October 2011, Kebriaiy asserts that Skelton and Williams actually knew of the Bank's plans for layoffs in April 2011. If so, they knew of the layoffs before Williams hired the CSO in May and the Senior Teller in August. Kebriaiy asserts that these facts, when viewed together with Williams's question to Kebriaiy about retiring and the "procedurally outlandish" final written warning, suggest that "the lay-off was a mere pretext to terminate Kebriaiy due to his age and disability." The evidence Kebriaiy cites to establish Skelton's and Williams's prior knowledge of the layoffs is deposition testimony by Connie Alcaraz-Ford, a Bank employee in the Employee Relations department, regarding the Bank's announcement of "[o]peration excellence" in April. Alcaraz-Ford described operation excellence as "a review . . . of all the business units and the bank as a whole," out of which "there may be some additions to jobs in certain departments and also some impact to jobs." There is nothing more in our record about operation excellence or how it relates to other events in the case. Even if operation excellence is another name for the "Branch Optimization

14

Initiative" that led to the October layoffs, Alcaraz-Ford's vague reference to the possibility of "some additions to jobs" and "some impact to jobs" is not evidence that Skelton or Williams was notified in April that layoffs would occur.

The evidence Kebriaiy submitted, in short, is insufficient to raise a reasonable inference that the Bank's reason for eliminating Kebriaiy's position was a pretext for unlawful discrimination based on either a disability or Kebriaiy's age. The Bank was therefore entitled to judgment on the disability and age discrimination claims arising from the termination of Kebriaiy's employment.

4. *Wrongful Termination in Violation of Public Policy*

Kebriaiy's cause of action for wrongful termination in violation of public policy is based solely upon the alleged FEHA violations. Because Kebriaiy's FEHA claims fail as a matter of law, so does his public policy claim. (See *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 355; *Higgins-Williams v. Sutter Medical Foundation* (2015) 237 Cal.App.4th 78, 87-88.)

5. *The Court's Failure to Address Kebriaiy's Pending Discovery Motion*

At the time of the hearing on the Bank's summary judgment motion, the court also had before it Kebriaiy's motions to compel further discovery responses. After the court granted the summary judgment motion, it ruled that the discovery motions were moot and declined to address them. Kebriaiy contends that the court should have either continued the hearing on the summary judgment motion or denied the motion "because of [the] Bank's delay tactics." We disagree.

Code of Civil Procedure section 437c, subdivision (h) provides a means for a party opposing a summary judgment motion to request a continuance to allow the party to obtain discovery of facts to support the opposition. The request must be supported by affidavits showing "that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented." (*Ibid.*) These affidavits must be "*submitted on or before the due date* for the opposition to the motion for summary judgment." (*Ambrose v. Michelin North America, Inc.* (2005) 134 Cal.App.4th 1350, 1357.) Kebriaiy did not make a timely request under this section or submit any affidavit with the required

information.  The court did not, therefore, err by failing to continue the motion for summary judgment.  (See *Thatcher v. Lucky Stores, Inc.* (2000) 79 Cal.App.4th 1081, 1083.)  Nor was there any basis for denying the motion based on speculation as to whether and what further discovery responses might have been forthcoming.

## DISPOSITION

The judgment is affirmed.  The Bank shall recover its costs on appeal.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


JOHNSON, J.